**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                     )

| | |
|---|---|
| **RAKESH KUMAR, Ph.D.** ) | |
| **1881 N. NASH STREET, #1802** ) | |
| **ARLINGTON, VA 22209** ) | |
| ) | **Civ. No. 1:15-cv-00120** |
| **Plaintiff** ) | |
| ) | **COMPLAINT** |
| **v.** ) | |
| ) | |
| ) | |
| **GEORGE WASHINGTON UNIVERSITY** ) | |
| **SERVE: MARY LYNN REED** ) | |
| **2100 PENNSYLVANIA AVENUE, NW** ) | |
| **SUITE 250** ) | |
| **WASHINTON, DC 20050** ) | |
| ) | |
| **Defendant** ) | |

_____)

**COMPLAINT**

COMES NOW Dr. Rakesh Kumar ("Dr. Kumar" or "Plaintiff"), and states his Complaint

against George Washington University ("GW" or "Defendant") as follows:

**THE PARTIES**

1.    Dr. Kumar is and at all times herein mentioned was, an individual residing in the

state of Virginia.  Dr. Kumar is Professor of Biochemistry and Molecular Medicine in the

Department of Biochemistry and Molecular Medicine at GW's School of Medicine and Health

Sciences.  Dr. Kumar resides at 1881 North Nash Street, #1802, Arlington, Virginia, 22209.

2.    GW is an academic institution of higher education authorized to conduct business

and conducting business in the District of Columbia with its principal place of business located

at 2121 I Street Northwest, Washington, DC 20052.  GW is comprised of numerous graduate and undergraduate schools.

## JURISDICTION AND VENUE

3.      Plaintiff brings this complaint under federal diversity jurisdiction, 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

4.      This Court has supplemental jurisdiction over all claims that form part of the same case or controversy pursuant to 28 U.S.C. § 1367.

5.      The Court may exercise personal jurisdiction over Defendant pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) because its principal place of business is in the District of Columbia.

6.      The proper venue for this case is the District of Columbia pursuant to 28 U.S. Code § 1391 as Defendant is a resident of the District of Columbia and a substantial part of the events or omissions giving rise to the claim occurred in the District of Columbia.

## FACTS

### Dr. Kumar's Employment at GW

7.      Dr. Kumar is a world-renowned and highly acclaimed research scientist.  Dr. Kumar has made valuable contributions to science regarding the roles of MTA1 and PAK1 pathways in cancer progression in over 215 peer-reviewed publications, more than 55 invited review publications, 4 meeting report publications, and 10 book chapters.  Dr. Kumar has also edited/co-edited six books or thematic volumes.  Finally, Dr. Kumar has delivered roughly 200 invited lectures at other institutions and national or international meetings.

8.     Defendant recruited Dr. Kumar through a final offer letter dated October 21, 2008 from the Dean of the School of Medicine and Health Sciences –signed by Dr. Jim Scott and approved by Executive Vice President for Academic Affairs, Dr. Donald R. Lehman, dated October 27, 2008, as a tenured professor and Chairman of the Department of Biochemistry and Molecular Biology (since renamed the Department of Biochemistry and Molecular Medicine) (hereinafter the "Department") and as the Catharine Birch & William McCormick Chair (hereinafter "McCormick Chair"), an endowed title that bestowed upon Plaintiff an average of $400,000 (range $312,780-492,078; 2009-2014) for genetic and genomic research and scholarly activities.

9.     Dr. Kumar started his employment on March 1, 2009 at GW as a tenured Professor, Chairman of the Department, and the McCormick Chair.

10.     Dr. Kumar is the Principal Investigator ("PI") in the Kumar laboratory at GW.

11.     Dr. Kumar was most recently reappointed to his positions at GW on July 23, 2014.  The reappointment letter dated July 9, 2014 states: "[t]his is to inform you of your reappointment as Professor of Biochemistry and Molecular Medicine with tenure, for the fiscal year beginning July 1, 2014." The letter also included an administrative supplement as Chair on administrative leave and contained a separate acceptance line for faculty and administrative appointments.

12.     As a tenured professor, the parties' rights and responsibilities are set forth in GW's Faculty Code, the Faculty Handbook, and other GW policies.

## GW's Research Misconduct Proceedings

13.     On December 17, 2012, GW began investigating allegations of research

misconduct asserted against Dr. Kumar pursuant to GW's Policy and Procedures Regarding

Allegations of Research Misconduct ("Policy").

14.     The Policy reflects policies and procedures promulgated by the Department of

Health and Human Services' ("HHS") Office of Research Integrity ("ORI"), which is

responsible for oversight of the use of federal funds in scientific research.

15.     The Policy requires that allegations of misconduct be "proven by a preponderance

of the evidence." Policy at §§ VI.D.1 and Definitions (L).

16.     The Policy also provides that "[i]nquiries and investigations will be conducted in

a manner that is designed to provide fair treatment to the respondent in the inquiry or

investigation and confidentiality to the extent possible without compromising public health and

safety or the thoroughness of the inquiry or investigation." *Id.* At § III(C).

17.     Additionally, the Policy states that "the investigation committee will consist of at

least three individuals who do not have real or apparent conflicts of interest in the case, are

unbiased, and have the necessary expertise to evaluate the evidence and issues related to the

allegations, interview the principals and key witnesses, and conduct the investigation." *Id.* at §

VI(C).

18.     Further the Policy provides that the "findings of the final report *will* take into

account the respondent's comments," *Id.* at § VII(A)(1) (emphasis added), and that the final

report "*will* include the actual text or an accurate summary of the views of any individual(s)

found to have engaged in misconduct." *Id.* at § VII(B) (emphasis added).

19.     The Policy further states that administrative actions against individuals accused of misconduct will be taken "when an allegation of misconduct has been *substantiated*," *Id.* at § X (emphasis added), and that interim administrative actions are only contemplated to protect Federal funds, protect ongoing research activities, and support the purposes of the Federal financial assistance. *Id.* at § XI(E).

20.     None of the allegations set forth in the misconduct proceedings asserted that Dr. Kumar conducted the underlying research or personally ever fabricated or falsified research data or prepared the figures in question for any of the manuscripts at issue in the proceedings.  Rather, all but one allegation centered on Dr. Kumar's **supervision** of the junior scientists in his laboratory and the existence of an allegedly stressful laboratory environment.  The one remaining allegation had woefully inadequate evidentiary support.

21.     An initial inquiry was conducted by GW through the then Research Integrity Officer, Dr. Anne Hirshfield.

22.     While the inquiry was underway, an anonymous source privy to confidential information about the GW inquiry released the confidential information to the online blog RetractionWatch.com.

23.     The RetractionWatch.com information concerning the confidential information about Dr. Kumar and the inquiry was posted on March 12, 20, 19, and 23, 2013.  In some of these posts, the anonymous blogger (self-designated as "Mr. Chromatin") posted confidential information about Dr. Kumar in postings that dealt with completely different persons and issues.

24.     In two of these RetractionWatch.com postings, on March 19 and 23, 2013, the anonymous blogger responded to another poster that "[y]es, ORI knows about it," referring to allegations regarding Dr. Kumar and publications and research originating from his laboratory.

25.     In addition, sources with knowledge of the confidential information about the GW inquiry disclosed confidential information to GW faculty members as well as certain individuals no longer associated with GW who had no involvement in the inquiry.

26.     On June 10, 2013, Dr. Hirshfield instructed three junior scientists, who were also respondents in the GW inquiry, that they should not assist Dr. Kumar in his response to the inquiry report despite the fact that they were from Dr. Kumar's laboratory and were involved in the underlying research at issue in the allegations asserted against Dr. Kumar.

27.     Dr. Hirshfield also told these scientists that if they did assist Dr. Kumar, their own inquiry defenses would be in jeopardy.

28.     On July, 11, 2013, Dr. Kumar submitted his response to the June 4, 2013 draft inquiry report.  In his submission, Dr. Kumar set forth numerous procedural and substantive deficiencies in the draft report and violations of GW's Policy and the federal regulations.

29.     GW apparently largely ignored Dr. Kumar's comments on the draft inquiry report and issued a final inquiry report that contained the same findings as the draft inquiry report.  In fact, both the draft and final inquiry reports were conspicuously dated June 4, 2013 despite the fact that the final inquiry report was accompanied by a November 8, 2013 cover letter.

30.     GW notified Dr. Kumar that it planned to initiate a formal investigation on November 8, 2013 that set forth proposed members of the Investigation Committee ("Investigation Committee" or "Committee").

31.     In an email dated November 22, 2013, Dr. Kumar responded that he objected to the inclusion of prospective Investigation Committee member, Dr. Ernest Prentice because he did not believe that Dr. Prentice had sufficient expertise in the specific area of research.

32.     As a result, on December 9, 2013, the Investigation Committee was empanelled

with the following members: Dr. Mark J. Solomon, Dr. Michael Fried, and Dr. Keith Crandall.

33.     On January 6, 2014, Dr. Kumar requested that the administration remove Dr. Keith Crandall from the Investigation Committee and from the position of Committee Chairman because of a conflict of interest as Dr. Crandall had an employment relationship with a former disgruntled employee of Dr. Kumar.  Dr. Crandall had met with Dr. on April 2, 2013 to discuss Dr. Kumar's former (disgruntled) employee who Dr. Crandall also hired.  In addition, Dr. Crandall asked Dr. Kumar for office space within the Biochemistry and Molecular Medicine Department.

34.     In a letter from GW's Senior Counsel dated January 8, 2014, GW refused Dr. Kumar's request to remove Dr. Crandall from the Investigation Committee and as Committee Chairman.  In the same letter, GW acknowledged that Dr. Crandall and the disgruntled former employee of Dr. Kumar had some employment related interactions.  On June 26, 2014, Dr. Crandall acknowledged to Dr. Kumar's Ph.D. student, Ms. Prakriti Mudvari, of a recently discovered conflict of interest that precluded him from participating in her dissertation committee.

35.     As part of its investigation, the Investigation Committee interviewed:  14 current and former members of Dr. Kumar's laboratory; Dr. Kumar; three members of Dr. Kumar's office staff; and five additional witnesses.

36.     On April 23, 2014, GW provided Dr. Kumar with 31 interview transcripts.

37.     A review of the transcripts makes clear that many of the interviews focused on Dr. Kumar's Chairmanship and character and had little, if anything, to do with the misconduct allegations.

38.     The members of the Investigation Committee engaged in improper and unfair

leading questioning that was designed to elicit the response that the questioner desired instead of a search for the truth.

39.     The members of the Investigation Committee repeatedly misrepresented testimony of witnesses to other witnesses during their interviews and coached witnesses to provide testimony that would immunize them while implicating Dr. Kumar.

40.     The Investigation Committee did not ask Dr. Kumar questions on the same subjects as those asked of the other witnesses.  Thus, Dr. Kumar did not have an opportunity to address certain assumptions or information held by the Investigation Committee.

41.     On April 23, 2014, the Investigation Committee issued the Committee's Draft Investigation Report.  The Investigation Committee concluded that Dr. Kumar committed misconduct in ten of the allegations.

42.     To support the Committee's preconceived conclusions, the Investigation Committee repeatedly misrepresented the testimony of witnesses and, on dozens of occasions, selectively relied on a witness's statements that were in direct conflict with the same witness's other statements or other available evidence.  The Draft Investigation Report did not acknowledge these contradictions and inconsistencies.

43.     The Investigation Committee's findings, including the allegation that found that Dr. Kumar engaged in intentional misconduct, were not supported by a preponderance of the evidence as is required under the Policy and the federal regulations.

44.     On June 6, 2014, Dr. Kumar submitted a comprehensive response to the Draft Investigation Report that explained in detail why the Committee's findings for each of the allegations of misconduct was erroneous, laid out GW's numerous violations of the Policy's provisions regarding fairness and the requirement that the investigation be free from both biases

and conflicts of interest, and described numerous due process violations.

45.     During a July 23, 2014 meeting with Provost Lerman, Dr. Kumar was handed a UBS-pin that contained a Word file of the Committee's final investigation report ("Final Investigation Report") dated July 21, 2014.

46.     Even though the investigation process was seriously flawed, the preponderance of the evidence indicated that Dr. Kumar was not responsible for any wrongdoing, and the Investigation Committee violated the Policy, the Faculty code, and the federal regulations, the Final Investigation Report set forth that Dr. Kumar was responsible for ten allegations of research misconduct.

47.     The Final Investigation Report did not adequately consider Dr. Kumar's significant comments and arguments set forth in his June 6, 2014 submission, as is required under the Policy and the applicable federal regulations, and was nearly identical to the Draft Investigation Report.

**As a Result of the Misconduct Proceedings, GW Denied Dr. Kumar a Raise**

48.     On July 11, 2013, Dr. Kumar received a draft reappointment letter dated July 9, 2013 to verify his salary and other information about his employment at GW.  The Department manager, Ms. Laura Lucs, noted and informed the administration on July 12, 2013 that the document was in final form except for one small change that was required:  correcting the name of the department to "Biochemistry and Molecular Medicine."  The July 9, 2013 letter contained a 3% salary raise from Dr. Kumar's previous year's salary.

49.     As mentioned above, Dr. Kumar submitted his response to the draft inquiry report on July 11, 2013 which forcefully argued that GW violated Dr. Kumar's due process and substantive rights in the course of the misconduct inquiry.

50.     On July 26, 2013, when Dr. Kumar received the final version of the reappointment letter dated July 9, 2013 the letter did not include the 3% salary raise that had been included in the earlier letter.

51.     When Ms. Lucs questioned the School of Medicine and Health Sciences' Financial Director, Swithin Kwamena-Poh, about the change in salary, Mr. Kwamena-Poh responded that a decision had recently been made not to give Dr. Kumar the raise that was in the original letter.

52.     The decision not to give Dr. Kumar a raise was not previously communicated to Dr. Kumar at any time, and Dr. Kumar consistently received excellent reviews for his chairmanship since 2009, including the last review for academic year 2012-2013 that had been conducted on February 1, 2014.

53.     Dr. Kumar received his reappointment letter dated July 9, 2014 on the morning of July 23, 2014, as a tenured professor for the academic year July 1, 2014 through June 30, 2015. The letter did not include any salary raise over the previous two years. Contrary to previous years, neither Dr. Kumar nor the department manager received a prior draft of the annual reappointment letter. Dr. Kumar was last provided a review for his performance as a Chairman and/or tenured professor on February 1, 2014.

### Before the Misconduct Proceedings were Complete, Dr. Kumar was Removed as Chairman of his Department and as the McCormick Chair

54.     On May 27, 2014, GW Provost Steven Lerman told Dr. Kumar that Dr. Kumar should voluntarily request administrative leave as Chair of the Department.  In the event that Dr. Kumar did not step down from his chairmanship, Provost Lerman told Dr. Kumar that he would formally remove Dr. Kumar and place him on administrative leave from his chairmanship.

55.     When Dr. Kumar asked for the reason for the requested resignation, Provost

Lerman stated he had reviewed the Draft Investigation Report and had deemed that Dr. Kumar was no longer fit to lead the Department as Chair.

56.     Dr. Kumar's meeting with the Provost and Vice Provost was the first instance in which he was accused of having negative performance as a chair.  Dr. Kumar had not previously received any such negative feedback about his performance from his reporting Dean or any other source.

57.     On May 28, 2014, Dr. Kumar, through the undersigned counsel, notified GW that the Provost's decision demanding a voluntary request for administrative leave was a violation of Dr. Kumar's rights.  This was especially true in light of the Investigation Committee's inappropriate use of the misconduct proceedings as a forum to make extensive inquiries regarding Dr. Kumar's chairmanship.

58.     Specifically, the undersigned counsel wrote GW, "[r]emoving Dr. Kumar from his position as department chair prior to the expiration of his term in July and without a formal review does not afford him the 'fairness' to which he is entitled under the federal regulations and the Policy.  The fact that this is a retaliatory action related to the misconduct investigation is made even clearer by the Investigation Committee's inappropriate use of the misconduct proceedings as a forum to make inquiries regarding Dr. Kumar's chairmanship.  The federal regulations are abundantly clear: investigations into alleged misconduct are intended to be 'objective and fair' and divorced from damage to a respondent's employment status and reputation unless and until there is a final finding of misconduct."

59.     On May 29, 2014, Dr. Kumar received a notice from the Provost informing him that he was put on administrative leave as a department chair as result of the findings of the Draft Investigation Report.

60.     On June 3, 2014, GW Dean Jeffrey Akman met with Dr. Kumar and informed him for the first time that he would be appointing Dr. William Weglicki as interim Chair of the Department.  Dean Akman also told Dr. Kumar that he would like to meet the department faculty on June 6, 2014 to convey his decision regarding the Chairmanship.

61.     A press release was issued on June 11, 2014 announcing Dr. Weglicki's chairmanship as of May 29, 2014.

62.     Before Dr. Kumar was removed from his position as Chairman of the Department, GW was already acting as if he had vacated that position.  Specifically, while Dr. Kumar was still Chairman, current Research Integrity Officer, Dr. Jennifer Wisdom, told Dr. Crandall (Chair of the Investigation Committee) to purchase a large piece of sequencing equipment using McCormick Genomic Chair Funds that were allocated to Dr. Kumar.  A discussion to this effect occurred in the May Research Council meeting attended by, among others, Dr. Vincent A. Chiappinelli, GW's Associate Vice President for Health Affairs and Associate Dean of the School of Medicine and Health Sciences.

63.     Additionally, during the early stages of the misconduct inquiry and investigation, the administration (through Dr. Chiappinelli) had previously met with Dr. Weglicki as early as September 2013 to secure his support as a standby acting chair should a need arise to have an interim Department chair. Dr. Weglicki informed Dr. Kumar on September 27, 2013 about his discussion with Dr. Chiappinelli who also made a reference to the inquiry into Dr. Kumar's involvement in the alleged misconduct.

64.     On November 1, 2013, Dr. Kumar, through the undersigned counsel, notified GW that the GW move to approach an individual to assume Dr. Kumar's position was inappropriate based on mere unsubstantiated allegations.

65.    On June 10, 2014, the Faculty of the Department authored a letter to the Provost expressing concerns about the manner in which Dr. Kumar was asked to take administrative leave as Chair, stated their positive opinion of him as Chair, and urged to the Provost to immediately reinstate Dr. Kumar as their chair.

**Before Making Any Finding of Misconduct, GW Delayed Processing Dr. Kumar's Grant Applications in Retaliation against Dr. Kumar and in Violation of GW Policy**

66.    On July 3 and 9, 2014, Dr. Kumar submitted to the Office of the Research Vice President ("OVPR") two National Institutes of Health ("NIH") applications including one revised R01 with a near funding score (CA98823-11A1; budget $1.98 million), and a letter with information requested from NIH for another 5-year grant application (CA18256601-A1; approximate approved budget $1.78 million) waiting to be awarded that needed additional details of animal numbers to be routed through OVPR to NIH to receive an award notice.

67.    GW's Proposal Policy provides: "[g]rant and contract proposals must be routed and approved for submission before they are sent to the sponsor for review. In order to assure sufficient time for review and approval by GW officials, all grant and contract proposals must be received by OVPR at least five business days before the deadline for submission."

68.    On July 14, 2014, the Department Grant Coordinator, Ms. Alison Kaufmann, spoke with Mr. Kai-Kong Chan in Office of the Vice President of Research about the status of the grant applications. She was told: "both of these grant applications are momentarily on hold, but [Dr. Kumar] is aware of the reason for this delay." Dr. Kumar had not been informed of any delay nor was he aware of any reason for such delay. Further, if the delay was because of the draft investigation report, that would be an improper and retaliatory action taken against Dr. Kumar.

69.     Dr. Kumar wrote to the Provost Lerman on July 18, 2014 regarding the status of these grant applications. By email dated July 18, 2014, Provost Lerman stated that: "I have decided that the university will not approve any of your grant applications until we have had the opportunity to meet to discuss the findings of the investigation committee."

70.     At a July 23, 2014 meeting, Dr. Kumar presented to Provost Lerman a July 23, 2014 e-mail regarding his outstanding grant application from the NIH that stated: "I have not received a response regarding the inquiry below. Please submit a response to me via your business office. OGA cannot issue an award until this concern is resolved." Provost Lerman stated to Dr. Kumar that he would consider his request to process this grant.

71.     Dr. Kumar's NIH funding would have run until February 2016 (CA90970), but in September 2014, GW relinquished this grant back to the NIH without informing Dr. Kumar. In addition, NIH contacted GW on September 5, 2014 acknowledging the award of the RO1 CA1825866-01A1 grant.  The funding of the new RO1 (CA1825866-01A1) extended until July 2019 but is now lost and unobtainable due to GW's intentional delaying of routing the letter to NIH.

**GW Retaliated by Failing to Respond to Dr. Kumar's Reasonable Requests for Approval of Visiting Professorship Appointments and in Relocating his Office**

72.     In recognition of Dr. Kumar's scientific contributions to cancer research, he was appointed Visiting Professor of Cancer Medicine at the Oxford University on March 18, 2014. On the same day, he sought approval of this adjunct appointment from GW.  Dr. Kumar routed another approval request to GW on March 28, 2014 for a visiting professorship at the Tata Memorial Center, Mumbai, India. Dr. Kumar has not received an approval from GW, contrary to previous external adjunct appointments that he received.

73.     As a founder and Chair of the Global Cancer Genomics Consortium (GCGC), Dr. Kumar co-organized the 4th GCGC Symposium on November 14 and 15, 2014 at Kyoto University in Japan. GW approved the travel and hotel reservations of Dr. Kumar in June 2014.

74.     On September 30, 2014, GW informed Dr. Kumar that the University had canceled his airline reservation.  On October 29, 2014, GW informed Dr. Kumar it was cancelling the hotel room originally booked for him and contacted the conference secretariat in Japan, and this room booking was in fact canceled. Nevertheless, Dr. Kumar co-chaired the 4th GCGC Symposium using alternative resources.

75.     GW has moved Dr. Kumar's office from the Department of Biochemistry and Molecular Medicine in Ross Hall, where he holds his appointment, to a location significantly distant from Ross Hall, despite Dr. Kumar's reasonable request to instead be moved to any other biochemistry office. GW retaliatory and punitive actions have deprived Dr. Kumar of day-to-day academic and scholarly interactions with other Biochemistry faculty, staff and students and unfairly robbed him of his overall participation in the Biochemistry department.

76.     GW's actions resulted in humiliation, reputational harm, and professional damage.

**GW Wrongly Denied Dr. Kumar the Opportunity
to Continue to Supervise his PhD Candidate and Omitted Him as Mentor in the PhD
Candidate's Thesis**

77.     GW's Faculty Code proves that "[a] faculty member shall enjoy freedom of investigation subject only to legal restrictions and such guidelines as shall be recommended by the Faculty Senate and adopted by the University."  Faculty Code § II(A)

78.     Dr. Kumar had supervised his Ph.D. student, Prakriti Mudvari, for several years on her dissertation from 2010 through 2014.

79.     On July 22, 2014, Ms. Mudvari shared the final dissertation draft of her PhD thesis with Dr. Kumar with the title page indicating, "Dissertation directed by Rakesh Kumar, PhD."

80.     On July 25, 2014, GW emailed Dr. Kumar to ask if he has any edits or corrections on Ms. Mudvani's Defense Program brochure, which listed Dr. Kumar as "Director of the Candidate's Research and Mentor."

81.     This was followed by two GW circulars on July 25, 2014 to over 110 faculty and staff members belonging to GW, Children National Organization, and NIH.  These emails announced the upcoming public defense of Ms. Mudvari with Dr. Kumar as her mentor for research work.

82.     However, later on July 25, 2014, in contravention of the Faculty Code, GW removed Dr. Kumar as Ms. Mudvari's supervisor.  On July 29, 2014, GW appointed Dr. Anelia Horvath as Ms. Mudvari's thesis advisor for both her public defense presentation as well as in the final PhD document submitted to GW.  Ms. Mudvari's thesis contains data and materials that resulted from Dr. Kumar's work and intellectual property developed together with Ms. Mudvari.

83.     At the public defense on August 1, 2014, GW presented Dr. Anelia Horvath as Ms. Mudvari's thesis advisor. Further, the final thesis submitted on August 9, 2014 incorrectly listed Dr. Anelia Horvath as Ms. Mudvari's dissertation director for the entire research period despite the fact that the work presented by Ms. Mudvari was performed under the mentorship and supervision of Dr. Kumar from 2010 until July 29, 2014. Both of these actions by GW were humiliating, painful, and damaging to Dr. Kumar's reputation.

84.     On September 30, 2014, Ms. Prakriti Mudvari e-mailed her recent CV to Dr. Kumar, listing him as her sole PhD Dissertation and Research Advisor.

**Despite an Unfair Investigation that Violated GW Policy and the Federal Regulations,
GW Imposed Harsh Sanctions on Dr. Kumar**

85.     In contravention of Dr. Kumar's rights as tenured professor and the provisions set

forth in the Faculty Code, at the July 23, 2014 meeting, Provost Lerman, stated that he would,

among other things, remove Dr. Kumar as Chair of the Department, remove him of his title and

benefits as McCormick Chair, and initiate the closure of Dr. Kumar's laboratory and revocation

of Dr. Kumar's tenure. Provost Lerman handed Dr. Kumar a letter setting forth these same points

in writing.  Provost Lerman also stated that he would "be open to negotiation" should Dr. Kumar

present an adequate "exit strategy," and that it was in the interest of both GW and Dr. Kumar to

avoid further dispute over this matter. Provost Lerman then stated that Dr. Kumar should "take a

few days" and consult with his attorneys and get back to him by August 1, 2014.

86.     In response to the Provost's July 23, 2014 invitation to Dr. Kumar to hold a

constructive dialogue related to this issue, Dr. Kumar, through undersigned counsel, sent a letter

to the Provost on July 25 at 1:15 pm requesting a meeting with him or his representatives to

discuss an exit strategy for Dr. Kumar as suggested by the Provost.

87.     On the morning of July 25, 2014, Dr. Kumar learned that within 60 days, a

number of actions would be taken with respect to Dr. Kumar's lab.

88.     On July 25, 2014, following the sending of the letter from Dr. Kumar described in

Paragraph 86, Dr. Kumar was summoned to a meeting at 1:30 p.m. with Dr. Chiappinelli, Dr.

Ray Lucas from Faculty Affairs, and Dr. Weglicki.  At this meeting, in contravention of Dr.

Kumar's rights as a tenured professor and the provisions set forth in the Faculty Code, Dr.

Chiappinelli told Dr. Kumar that GW's Provost Office, in conjunction with the Human

Resources Department, was initiating immediate closure of Dr. Kumar's laboratory and office by

5:00 pm that day. Dr. Chiappinelli also told Dr. Kumar that the University replaced him as the

PhD mentor for his student Ms. Prakriti Mudvari for purposes of her August 1, 2014 public

defense.

89.     In contravention of Dr. Kumar's rights as tenured professor and the provisions set

forth in the Faculty Code, Dr. Chiappinelli also told Dr. Kumar that he is not permitted to meet

alone with his laboratory members or Department faculty prior to leaving campus.

90.     In contravention of Dr. Kumar's rights as tenured professor and the provisions set

forth in the Faculty Code, Dr. Chiappinelli stated that Dr. Kumar's badge would no longer be

operational and demanded that Dr. Kumar leave GWU campus immediately after the meeting.

Dr. Kumar was also told that he is not permitted to come back to Ross Hall, where his office and

laboratory are located, without prior permission from GW.  Dr. Weglicki offered to chaperone

Dr. Kumar's return to his office and consequently remained with Dr. Kumar.  Subsequently, at

2:30 pm on July 25, 2014, while Dr. Kumar was in a meeting with his faculty and office staff

including, Acting Chair Dr. Weglicki and Acting Department Manager Ms. Nichole Webster, in

his office, GW security arrived in Ross 530 and demanded that Dr. Kumar must stop the on-

going meeting.  GW security informed Dr. Kumar that they were there to escort him out of Ross

Hall. Dr. Weglicki had offered to escort Dr. Kumar instead of the GW security - sent by the

administration. Dr. Kumar's removal by GW Security was very public and humiliating, and has

irreparably damaged Dr. Kumar's reputation.

91.     GW told Dr. Kumar's laboratory members to immediately leave the laboratory.

GW also told scientists from Dr. Kumar's laboratory that the laboratory would be closing at 5:00

p.m. that day and to immediately cease and discard on-going experiments (including the

cultivation of tissue cultures).  These instructions were communicated orally to the laboratory

members.

92.     On August 5, 2014, the Faculty of the Department authored a letter to the

President Steven Knapp with copy to Provost expressing their concerns about "the humiliating

escort" of Dr. Kumar on July 25, 2014, asking why Dr. Kumar was ousted from the

chairmanship and removed as McCormick Chair without explanation to the department faculty,

and why Dr. Kumar was barred from entering Ross Hall.

93.     Despite extensive effort and offers of various settlement proposals, the parties

have not been able to reach any resolution of this conflict.

**GW's Wrongful Delay and then Relinquishment of Dr. Kumar's Grant Applications Have**
**Thwarted Dr. Kumar's Efforts to Gain Employment Elsewhere**

94.     When Dr. Kumar learned that GW was planning to revoke his tenure and would

prevent him from continuing his life's work as a researcher, he began to seek out employment at

other academic institutions.

95.     One such institution, a highly prestigious local institution ("Prestigious Local

Institution"), was extremely interested in having Dr. Kumar join its faculty when Dr. Kumar

commenced discussions with the institution in August 2014.

96.     Dr. Kumar was forthright with Prestigious Local Institution about the

investigation and the findings contained in the Final Investigation Report.  Indeed, Dr. Kumar,

through undersigned counsel, provided Prestigious Local Institution with a copy of the Final

Investigation Report as well as his response to the Draft Investigation Report that was redacted

to protect the identities of Dr. Kumar's co-respondents on August 8, 2014.

97.     Prestigious Local Institution's senior counsel and VP of Regulatory Affairs

("Regulatory Affairs Administrator")  reviewed the Final Investigation Report and concurred

with Dr. Kumar that: GW abused the inquiry and investigation processes set forth in the Policy and in the applicable federal regulations; that GW had not proved by a preponderance of the evidence that Dr. Kumar committed research misconduct; and that Health and Human Service's Office of Research of Research Integrity would likely choose not to pursue the allegations set forth in the Final Investigation Report.

98.     In addition to Dr. Kumar's world-renowned reputation as a researcher on the cutting edge of science, a major factor in Prestigious Institution's interest in hiring Dr. Kumar was the fact that more than $4.3 million in grants accumulating since 2009 had been awarded to Dr. Kumar.

99.     While Prestigious Local Institution was in the final stages of the hiring process before making Dr. Kumar an offer to retain him as a faculty member, NIH, the grantor of one of the grants, required response from GW regarding whether GW would accept a newly awarded five year grant on Dr. Kumar's behalf.

100.     Rather than engage in the relatively simple procedure of accepting a grant on a scientist's behalf and then relinquishing the grant to the scientist's subsequent institution, in September 2014, GW returned the grant to NIH despite Dr. Kumar's numerous pleas not to do so and warning of the damage it would cause to him.

101.     The Regulatory Affairs Administrator of Prestigious Local Institution commented about GW's decision to relinquish the grant to NIH, "[d]oes GW understand that if they do not accept the award they are impeding Dr. Kumar's ability to move to another medical center?"

102.     The answer to that Regulatory Affairs Administrator's question is yes, GW knew that its actions would have the effect of "impeding Dr. Kumar's ability to move to another medical center" as Dr. Kumar and his attorneys repeated explained this fact to GW.

Unfortunately, these arguments fell on deaf ears.

103.    Negotiations with Prestigious Local Institution halted after GW relinquished the grants that had been awarded to Dr. Kumar.

104.    Despite diligent efforts, Dr. Kumar has been unable to obtain a research position at another academic institution at either the local or the national level.

### Dr. Kumar is Suffering Ongoing Damages

105.    Dr. Kumar enjoyed a stellar reputation in the scientific community before the misconduct proceedings were commenced.

106.    Dr. Kumar's professional reputation and career has been irreparably injured as a result of unfair, biased, and factually unsupported misconduct proceedings that are contrary to GW policies and the applicable federal regulations and breaches of required confidentiality.

107.    Dr. Kumar was denied a promised higher salary, was removed as the PhD mentor for a student with whom he has supervised for 4 years, lost  approximately  $2.4 million in active and awarded grants (in addition to $1.98 million in renewal application that GW actions caused to be blocked), was removed from his position as department chair with approximately $400,000 in discretionary funds, GW has threatened to revoke his tenure, and GW deprived Dr. Kumar of academic and scholarly interactions with his department by relocating him to a remote location outside the Department of Biochemistry and Molecular Medicine and School of Medicine and Health Sciences.

108.    Prestigious Local Institution decided not to hire Dr. Kumar once GW relinquished Dr. Kumar's grants.

109.    Dr. Kumar has not been able to find other research employment at other academic institutions.

110.    GW has prevented Dr. Kumar for continuing his life's work as a cancer researcher.

## COUNT I
### (Breach of Contract)

111.    Dr. Kumar repeats and re-alleges the allegations contained in paragraphs 1-110 above as if set forth fully herein.

112.    Dr. Kumar is in a contractual relationship with GW through his employment agreements with GW and GW's policies and procedures.

113.    Dr. Kumar fully complied with all provisions set forth in the employment agreements and GW's policies and procedures.

114.    As more fully alleged above, without any legal justification, GW breached its contracts with Dr. Kumar by failing to adhere to the procedures and protections set forth in GW's policies and Dr. Kumar's employment agreements with GW in ways including, but not limited to, the following:

  a. Disclosing confidential information concerning the misconduct proceedings in violation of the Policy and the applicable federal regulations;

  b. Failing to ensure that the misconduct proceedings were carried out in a fair and unbiased manner, by a panel who was free from personal, professional or other conflicts of interest;

  c. Failing to ensure that the findings were supported by a preponderance of

the evidence as is required by the Policy and the federal regulations;

d.   Failing to adequately or meaningfully address and consider Dr. Kumar's detailed and comprehensive response for purposes of creating the final investigation report as is required by the Policy;

e.   Preventing Dr. Kumar from continuing to conduct his research and mentor his students;

f.   Prematurely removing Dr. Kumar from the Department chairmanship and the McCormick Chair ; and

g.   Failing to follow its own procedures for grant processing.

115.   Dr. Kumar has suffered damages as a direct and proximate result of GW's breach of the employment agreements and GW's policies including but not limited to the following:

a.   Long-term injury to his professional reputation and career;

b.   Loss of over $2.35 million in grants in addition to $1.98 million in renewal grant applications that have been blocked;

c.   Loss of the opportunity of employment at Prestigious Local Institution;

d.   Loss of the Department chairmanship;

e.   Loss of the McCormick Chairmanship;

f.   Loss of Salary Increase; and

g.   Loss of opportunity of employment at other institutions.

## <u>COUNT II</u>
### (Breach of the Covenant of Covenant of Good Faith and Fair Dealing)

116.   Dr. Kumar incorporates by reference the allegations in paragraphs 1-115 above.

117.   A covenant of good faith and fair dealing is implied in every contractual relationship in the District of Columbia, including those between Dr. Kumar and GW.

118.   GW breached its covenant of good faith and fair dealing by, among other things:

    a.   Acting in bad faith when it failed to protect Dr. Kumar's confidentiality in the misconduct proceedings;

    b.   Acting in bad faith when it failed to ensure that the misconduct proceedings were free of bias and conflict of interest;

    c.   Acting in bad faith when it failed to prove the misconduct allegations by a preponderance of the evidence as is required by the Policy and the federal regulations;

    d.   Failing to adequately or meaningfully address and consider Dr. Kumar's detailed and comprehensive response for purposes of creating the final investigation report as is required by the Policy;

    e.   Acting in bad faith when it planned then executed the removal of Dr. Kumar from the Department Chairmanship and the McCormack Chairmanship prior to the completion of misconduct proceedings;

    f.   Acting in bad faith when it prevented Dr. Kumar from continuing to mentor a PhD candidate who Dr. Kumar had supervised for over 4 years, and intentionally omitting Dr. Kumar as his PhD student's research director in the PhD Thesis for the entire period she worked under Dr. Kumar;

    g.   Acting in bad faith when it publicly escorted Dr. Kumar from campus and prevented him from entering his office and laboratory;

    h.   Acting in bad faith when it refused Dr. Kumar from continuing the research that is at the heart of his career and employment at GW; and

     i.   Acting in bad faith when it relinquished Dr. Kumar's grants which could easily have been held by GW until transferred to Dr. Kumar's next employer.

119.    GW's actions had the effect of destroying Dr. Kumar's right to the fruits of his contractual relations with GW.

120.    Dr. Kumar has suffered damages as a direct and proximate result of GW's breach of the covenant of good faith and fair dealing including but not limited to the following:

    a.   Long-term injury to his professional reputation and career;

    b.   Loss of over $2.35 million in grants in addition to $1.98 million in renewal grant applications that have been blocked;

    c.   Loss of the opportunity of employment at Prestigious Local Institution;

    d.   Loss of the Department chairmanship and the McCormick Chair ;

    e.   Loss of Salary Increase; and

    f.   Loss of opportunities of employment at other institutions.

## <u>COUNT III</u>
### (Tortious Interference with Business Relations)

121.    Dr. Kumar repeats and re-alleges the allegations contained in paragraphs 1 through 120 above as if set forth fully herein.

122.    Dr. Kumar had a reasonable expectancy of a position on the faculty of Prestigious Local Institution.

123.    Through its communications with the undersigned counsel, GW knew and understood that Dr. Kumar was in serious negotiations with Prestigious Local Institution that was extremely interested in having him join the faculty.

124.   GW relinquished Dr. Kumar's grants with the understanding that doing so would make Prestigious Local Institution significantly less interested in hiring Dr. Kumar.

125.   As a direct result of GW's relinquishment of Dr. Kumar's grants, Prestigious Local Institution decided not to hire Dr. Kumar.

126.   GW acted with evil motive, actual malice, or with intent to injure, or in willful disregard for the rights of Dr. Kumar.

127.   GW's conduct was outrageous, grossly fraudulent, or reckless toward the career and livelihood of Dr. Kumar.

128.   Dr. Kumar has suffered substantial damages as a direct and proximate result of GW's interference with his business relations with Prestigious Local Institution in that the institution decided not to hire Dr. Kumar a member of its research faculty.

## COUNT IV
### (Tortious Invasion of Privacy)

129.   Dr. Kumar repeats and re-alleges the allegations contained in paragraphs 1 through 128 above as if set forth fully herein.

130.   As describe herein, GW improperly disclosed confidential information concerning the misconduct proceeding to Dr. Kumar's colleagues and the public.

131.   The confidentiality of the disclosed information is protected by the Policy and the applicable federal regulations (*e.g.* 42 C.F.R. § 93.108).

132.   The information disclosed concerns the private life, career, and reputation of Dr. Kumar.

133.   The disclosure of this information would be highly offensive to a reasonable person.

134.    Further, the GW's disclosure concerning the misconduct proceedings and Dr. Kumar's employment status at GW are not of legitimate concern to the public.

135.    GW acted with evil motive, actual malice, or with intent to injure, or in willful disregard for the rights of Dr. Kumar.

136.    GW's conduct was outrageous, grossly fraudulent, or reckless toward the reputation of Dr. Kumar.

137.    GW's actions injured Dr. Kumar in numerous ways, including, but not limited to, the following:

   a.   Long-term injury to Dr. Kumar's professional reputation and career; and

   b.   Loss of employment at Local Prestigious Institution as well as other academic institutions.

## COUNT V
### (False Light)

138.    Dr. Kumar repeats and re-alleges the allegations contained in paragraphs 1-137 above as if set forth fully herein.

139.    As described herein, GW improperly disclosed confidential information concerning the misconduct proceeding to Dr. Kumar's colleagues and the public.

140.    GW has publically and falsely stated, represented or imputed that Dr. Kumar has engaged in research misconduct.

141.    GW acted with evil motive, actual malice, or with intent to injure, or in willful disregard for the rights of Dr. Kumar.

142.    GW's conduct was outrageous, grossly fraudulent, or reckless toward the reputation of Dr. Kumar.

143.    GW's actions have placed Dr. Kumar in a false light that would be offensive to a reasonable person.

144.    GW's actions injured Dr. Kumar in numerous ways, including but not limited to the following:

    a.   Long-term injury to Dr. Kumar's professional reputation and career; and

    b.   Loss of employment at Local Prestigious Institution as well as other academic institutions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Dr. Kumar respectfully requests that this Court:

(a) Enter judgment in his favor;

(b) Award Dr. Kumar damages against GW, including punitive damages, to be determined at trial believed to be in excess of $8 million;

(c) Award Dr. Kumar's costs and reasonable attorney's fees; and

(d) Award Dr. Kumar any and all other relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff, Dr. Kumar hereby demands a trial by jury on issues so triable.

Dated: January 23, 2015                    Respectfully submitted,

                                           DR. RAKESH KUMAR


                                           By his attorneys,

                                           THALER LIEBELER, LLP


                                           Paul S. Thaler (D.C. Bar No. 416614)
                                           Diana J. Pomeranz
                                           1825 Eye Street NW
                                           Suite 400
                                           Washington, D.C.  20006
                                           (202) 466-4110
                                           Fax (202) 466-2693
                                           Attorneys for Plaintiff