**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| RAKESH KUMAR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:15-cv-00120-JDB |
| | ) | |
| GEORGE WASHINGTON UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

---

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**DEFENDANT GEORGE WASHINGTON UNIVERSITY'S MOTION TO DISMISS**

Barbara Van Gelder (DC Bar No. 265603)
Christopher J. Allen (DC Bar No. 976426)
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, DC  20006-5403
Telephone:  (202) 420-4845
Facsimile:   (202) 420-2201
vangelderb@dicksteinshapiro.com
allenc@dicksteinshapiro.com

*Counsel for Defendant George Washington University*

## TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................1

BACKGROUND ............................................................................................................1

ARGUMENT..................................................................................................................5

I.     Plaintiff Fails to State a Claim that the University Breached Its Contract with Him. ..........5

       A.     The University did not breach its agreement with Plaintiff when it removed him from his at-will chairmanship. ...........................................................................5

       B.     The University did not breach its agreement with Plaintiff when it did not increase his salary. ...............................................................................................7

II.    Plaintiff Has Not Pled A Lack of Good Faith and Fair Dealing.........................................8

       A.     The Investigation Committee was unbiased and conflict-free................................9

       B.     The Committee's findings were supported by a preponderance of evidence and the Committee considered Plaintiff's response to the Draft Investigation Report.................................................................................................................11

       C.     The University acted pursuant to its Misconduct Policy and its legal obligation to protect federal funds when it curtailed Plaintiff's ongoing research and put on hold submissions for federal grants related to that work.......12

       D.     Plaintiff's allegations that the University disclosed confidential information concerning the misconduct proceedings are pure conjecture and insufficient to state a claim. ..................................................................................................16

III.   Plaintiff Fails to Adequately Plead that the University's Treatment of His Grants Tortiously Interfered with Plaintiff's Business Relations..................................................18

IV.   Plaintiff's Claims for Invasion of Privacy and False Light Are Time-Barred and Lack Sufficient Support. .............................................................................................................21

CONCLUSION..............................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ajisefinni v. KPMG LLPI*,
  17 F. Supp. 3d 28, 51 (D.D.C. 2014) ..................................................................5, 7

*Al-Hendy v. Meharry Medical College*,
  No. 3:11-1201, 2014 WL 3853839 (M.D. Tenn. Aug. 6, 2014)......................................15, 19

*Allworth v. Howard University*,
  890 A.2d 194 (D.C. 2006) ..............................................................................8, 9

*Armstrong v. Thompson*,
  80 A.3d 177, 191 (D.C. 2013) ..............................................................................20

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2008)..........................................................................................11

*Bannum, Inc. v. Citizens for a Safe Ward Five, Inc.*,
  383 F. Supp. 2d 32 (D.D.C. 2005) ........................................................................19

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)..........................................................................................16

*Howard R. L. Cook & Tommy Shaw Foundation ex rel. Black Employees of Library of Congress,
Inc. v. Billington*,
  737 F.3d 767 (D.C. Cir. 2013) ............................................................................11

*Casanova v. Marathon Corp.*,
  256 F.R.D. 11 (D.D.C. 2009)................................................................................1

*Doe v. Southeastern University*,
  732 F. Supp. 7 (D.D.C. 1990) ............................................................................22

*Furash & Co. v. McClave*,
  130 F. Supp. 2d 48 (D.D.C. 2001) ......................................................................18

*Greenpeace, Inc. v. Dow Chemical Co.*,
  97 A.3d 1053, 1061-62 (D.C. 2014) ....................................................................21

*Hall v. Ford*,
  856 F.2d 255 (D.C. Cir. 1988) ............................................................................6

*Hodges v. Government of the District of Columbia*,
  975 F. Supp. 2d 33 (D.D.C. 2013) ......................................................................17

*Hoff v. Wiley Rein, LLP*,
   No. 14-CV-049, 2015 WL 858299 (D.C. Feb. 12, 2015) ........................................................6

*Jones v. District of Columbia Water & Sewer Authority*,
   943 F. Supp. 2d 90 (D.D.C. 2013) ........................................................................................6

*Kalderon v. Finkelstein*,
   2010 WL 9488933 (S.D.N.Y. Mar. 10, 2010), *rev'd in part on other grounds*, 2010 WL
   3359473 (S.D.N.Y. Aug. 25, 2010) *aff'd*, 495 F. App'x 103 (2d Cir. 2012) .........................15

*McCaskill v. Gallaudet University*,
   36 F.Supp.3d 145 (D.D.C. 2014) ........................................................................................22

*Mullin v. Washington Free Weekly, Inc.*,
   785 A.2d 296 (D.C. 2001) ...................................................................................................22

*Onyeoziri v. Spivok*,
   44 A.3d 279, 286 (D.C. 2012) ........................................................................................18, 20

*Roberson v. District of Columbia Board of Higher Education*,
   359 A.2d 28 (D.C. 1976) .......................................................................................................7

*Slate v. Public Defender Service for District of Columbia*,
   31 F.Supp.3d 277, 287 (D.D.C. 2014) ...................................................................................1

*Tavoloni v. Mount Sinai Medical Center*,
   26 F. Supp. 2d 678 (S.D.N.Y. 1998)....................................................................................15

*United States v. Mahoney*,
   247 F.3d 279 (D.C. Cir. 2001) ..............................................................................................7

**Other Authorities**

42 C.F.R. § 93.100 .....................................................................................................................2

42 C.F.R. § 93.315 .....................................................................................................................4

42 C.F.R. § 93.319(a)..................................................................................................................4

Fed. R. Civ. P. 12(b)(1)...............................................................................................................1

Fed. R. Civ. P. 12(b)(6)...............................................................................................................1

*Federal Policy on Research Misconduct,* 65 Fed. Reg. 76,260, 76,263 (Dec. 6, 2000)..................1

NIH Grants Policy Statement § 2.3.6, "Legal Implications of Applications" (Oct. 2013)......15, 20

## INTRODUCTION

Having received the full procedural due process provided by both federal regulations and University policy, Plaintiff Rakesh Kumar, Ph.D. ("Plaintiff" or "Dr. Kumar") filed this action in an effort to have the Court second-guess the determination of George Washington University ("GW," "Defendant," or "the University") that Dr. Kumar engaged in research misconduct in connection with federally funded grants to the University.  Plaintiff does not set forth facts sufficient to state a claim, whether based in contract or tort, for any of the five causes of action alleged.  For the reasons set forth in more detail below, Plaintiff's Complaint should be dismissed in its entirety pursuant to Fed. R. Civ. P. 12(b)(6).[1]

## BACKGROUND

The University hired Dr. Kumar in October 2008 as a Professor of Biochemistry and Molecular Biology in the GW Medical Center's Department of Biochemistry and Molecular Biology (now Department of Biochemistry and Molecular Medicine).  Complaint ¶8.[2]  At the same time, the Dean of the School of Medicine and Health Services appointed him to an "at-will" position as the Catharine Birch and William P. McCormick Chair of the Department.[3]

---

[1] There are also grounds to dismiss Plaintiff's Complaint pursuant to Fed. R. Civ. P. 12(b)(1).  For example, as a federally funded research institution, GW is exercising a delegated discretionary governmental function when it investigates and adjudicates allegations of research misconduct and, therefore, should be immune from suit.  *See Federal Policy on Research Misconduct,* 65 Fed. Reg. 76,260, 76,263 (Dec. 6, 2000) ("Agencies and research institutions are partners who share responsibility for research process.  Federal agencies have ultimate oversight authority for the Federally funded research but research institutions bear primary responsibility for prevention and detection of research misconduct and for the inquiry, investigation and adjudication of research misconduct alleged to have occurred in association with their own institution.").  Since these arguments would be matters of first impression in this District, the University reserves its right to present these arguments at a later time.  *See, e.g., Casanova v. Marathon Corp.*, 256 F.R.D. 11, 12 (D.D.C. 2009) (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006)) ("[A] court may at any time consider a challenge to its jurisdiction over the subject matter of a case.").

[2] For purposes of this motion only, GW treats the allegations of the Complaint as true.

[3] Plaintiff's appointment was solely at the pleasure of the University, a fact of which Plaintiff was made clearly aware in the letter agreements that constituted his employment contracts with the University.  Copies of these letters are attached as Exhibits "A" and "B."  While Plaintiff did not attach any copies of these letters to his Complaint, the Court may take judicial notice of them, as well as the publicly available policies of the University described below, without converting this present Motion to Dismiss into one for Summary Judgment because Plaintiff's claims necessarily rely on the content of such documents.  *See, e.g., Slate v. Pub. Defender Serv. for D.C.*, 31 F.Supp.3d

Both before and subsequent to coming to GW, Plaintiff also was the Principal Investigator ("PI") for National Institute of Health ("NIH")-funded grants to the University.  Complaint ¶10. Plaintiff often published the results of his federally-funded research in several peer-reviewed scientific journals.  Complaint ¶7.

On October 2, 2012, the University received a letter from the Division of Investigative Oversight in the Office of Research Integrity ("ORI") of the U.S. Department of Health and Human Services ("HHS") notifying it that ORI had received anonymous allegations that Plaintiff had engaged in research misconduct as defined by ORI regulations.[4]  Pursuant to its legal obligations and following the procedure set forth in the Faculty Handbook and the University's "Policy and Procedures Regarding Allegations of Research Misconduct" ("Misconduct Policy"),[5] the University's Research Integrity Officer ("RIO") initiated the required process to evaluate the allegations against Plaintiff.  Complaint ¶14.  During the course of this inquiry, which included a review of information on a publicly-available website, *Science-Fraud.org*, the RIO learned of additional allegations of research misconduct against Plaintiff.

The RIO completed her initial inquiry on June 4, 2013, and immediately provided a draft

---

277, 287 (D.D.C. 2014) ("This conversion rule [from Motion to Dismiss to Summary Judgment] need not be triggered, however, when a court considers the facts alleged in the complaint, documents ... incorporated by reference in the complaint ... or documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss.") (quotations omitted).

[4] *See* 42 C.F.R. § 93.100. ("HHS has ultimate oversight authority for PHS [Public Health Service] supported research… Institutions and institutional members have an affirmative duty to protect PHS funds from misuse… and primary responsibility for responding to and reporting allegations of research misconduct….").

[5] Plaintiff's original letter agreement (Exh. A) stated that "Copies of the Faculty Code and Faculty Handbook are enclosed for your review.  Your acceptance of this appointment also constitutes your agreement to accept and be bound by the conditions described in these documents."  The Faculty Handbook provides that "the University's Policy on Misconduct in Research… set[s] forth… procedures for investigating and resolving allegations of misconduct," which since 2005 has been memorialized in the University's Misconduct Policy.  Handbook § 5-6. The Misconduct Policy sets forth a detailed, multi-stage process by which the University evaluates allegations of misconduct pursuant to ORI regulations.  Copies of the Misconduct Policy and Faculty Handbook are attached as Exhibits "C" and "D," respectively.  For the same reason as the letters attached as Exhibits A and B, this Court may consider them without converting this Motion to Dismiss into a Motion for Summary Judgment, *see* n.2, *supra*.

copy of her findings to Plaintiff, who submitted his response a week later.  Complaint ¶28.

Ultimately, the RIO's inquiry identified fourteen allegations warranting formal review by an

Independent Investigation Committee (the "Committee").

On November 8, 2013, the University—as required by federal law and its own policies—

notified Plaintiff by letter that the internal investigation would proceed, and identified proposed

members of the Committee.  Complaint ¶30.  After granting Plaintiff's request to remove one

proposed member, who Plaintiff claimed lacked subject matter expertise, the University

proposed a replacement.  Complaint ¶¶31-32.  After being allowed a week to consider the new

Committee, Plaintiff responded on December 16, 2013, that he was unaware of any personal or

professional conflicts with the members of the Committee, but then on January 6, 2014, Plaintiff

notified the University of another, previously unmentioned alleged conflict with the proposed

head of the Committee.  Complaint ¶33.  The University considered Plaintiff's new claim of a

conflict, despite the late hour, but determined no conflict existed; the Committee then proceeded

with the Internal Investigation.  Complaint ¶34.

The Committee, along with outside counsel and the RIO, interviewed numerous

witnesses and reviewed research materials and other evidence over the course of four months.

Complaint ¶35.  On April 23, 2014, the Committee prepared a 138-page Draft Investigation

Report concluding that Plaintiff committed research misconduct with respect to ten of the

allegations, and, pursuant to Misconduct Policy § VII(A)(1), the Committee provided the report

to Plaintiff for his review and comment.  Complaint ¶41.  Plaintiff was also provided with

interview transcripts and other underlying information supporting the Committee's conclusion

that Plaintiff had engaged in research misconduct.  Complaint ¶36.  On June 6, Plaintiff provided

a response to the Committee's Draft Investigation Report for the Committee's consideration,

which argued, among other things, that the investigation violated his due process rights.

Complaint ¶49.

On July 21, 2014, the Committee completed its Final Report addressing Plaintiff's response but retaining its original conclusion that Plaintiff engaged in research misconduct with respect to ten allegations.  Complaint ¶45.  The Committee also recommended that Plaintiff retract several published papers that contained fabricated data.  Pursuant to the University's Misconduct Policy § VII(D), the Final Report was provided to Provost Steven Lerman and also to ORI pursuant to federal regulations.[6]

Provost Lerman took prompt action to protect the integrity of the University's research program and the federal funds that support the program.  *See, e.g.*, Misconduct Policy § X ("The university will take appropriate administrative actions against individuals when an allegation of research misconduct has been substantiated as determined by the Provost after consultation with the RIO."); § XI(E) ("University officials will take interim administrative actions, as appropriate, to protect Federal funds, protect ongoing research activities, and support the purposes of the Federal financial assistance.").[7]  Exercising its right under the terms of Plaintiff's appointment, the University relieved Plaintiff of his duties as Chair of the Department in June 2014.  Since federal grants are issued to and belong to the institution supporting research, not the Principal Investigators, the University in July 2014 also placed on hold submissions on behalf of Plaintiff with respect to grants supporting his research.  This included delaying submission of a revised "R01" form for one grant (CA98823-11A1) that funded research that was a subject of allegations of research misconduct, and delaying submission of a letter with information requested by NIH

---

[6] *See* 42 C.F.R. § 93.315.

[7] *See also* 42 C.F.R. § 93.319(a) ("Institutions may have internal standards of conduct different from the HHS standards for research misconduct under this part. Therefore, an institution may find conduct to be actionable under its standards even if the action does not meet this part's definition of research misconduct.").

for a new 5-year grant application (CA18256601-A1).  Complaint ¶66.  The University further

relinquished back to HHS another grant (CA90970), which also had funded research that was

subject to the allegations of misconduct.  Complaint ¶71.  On July 25, 2014 (after the Committee

had issued its Final Report and conclusion that Plaintiff engaged in research misconduct), the

University suspended Plaintiff's research and activities related to the allegations.  Complaint

¶¶87-88.  Plaintiff remains a University faculty employee receiving his faculty salary.  Plaintiff

filed this Complaint on January 25, 2015.

### ARGUMENT

**I.**   **Plaintiff Fails to State a Claim that the University Breached Its Contract with Him.**

Under D.C. law, a claim for a breach of contract includes four elements: "(1) a valid

contract between the parties; (2) an obligation or duty arising out of contract; (3) a breach of that

duty; and (4) damages caused by breach." *Ajisefinni v. KPMG LLPI*, 17 F. Supp. 3d 28, 51

(D.D.C. 2014) (citing *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009)).  Plaintiff

has failed to plead facts sufficient to support his claim that the University breached its contract

with him, and therefore that claim should be dismissed.

**A.**   The University did not breach its agreement with Plaintiff when it removed him
from his at-will chairmanship.

Plaintiff's allegation that the University breached its contract by removing him from his

department chairmanship is contrary to the express terms of his employment agreements.

Plaintiff accepted appointment to the faculty for the fiscal year 2008-2009 by signing and

returning an appointment letter dated October 27, 2008.[8]  In the same letter, he also accepted the

appointment as the Catharine Birch and William P. McCormick Chair of the Department of

Biochemistry and Molecular Biology.  That letter set forth the "terms of [Plaintiff's]

---

[8] *See* Exhibit A.

appointment," which included the components of his salary for the 2008-2009 fiscal year, and

benefits.  The letter expressly noted that the chairmanship was "an administrative position and in

this capacity you serve at the pleasure of the Dean."  Each subsequent year between 2009 and

2013, Plaintiff executed a reappointment letter providing the terms of his employment for the

coming fiscal year.  The terms in each of those letters were substantively identical, including that

the chairmanship was "an administrative position" in which Plaintiff would "serve at the

pleasure of the Dean," or later, "the University."[9]

The language "at the pleasure of" creates an at-will employment under D.C. law.  *See,*

*e.g., Hall v. Ford*, 856 F.2d 255, 265-66 (D.C. Cir. 1988) (Appellant signed an agreement saying

that he would "serve at the pleasure of the President," which "presumptively [made Appellant]

an at-will employee with no legitimate expectation of continued employment.") (internal

quotations omitted).  It has long been "a general rule in the District of Columbia [that] 'an

employer may discharge an at-will employee at any time and for any reason, or for no reason at

all.'"  *Hoff v. Wiley Rein, LLP*, No. 14-CV-049, 2015 WL 858299, at *2 (D.C. Feb. 12, 2015)

(quoting *Adams v. George W. Cochran & Co.*, 597 A.2d 28, 30 (D.C. 1991)).

A claim for breach of contract regarding termination of at-will employment, even

accompanied by allegations of retaliation, accordingly fails as a matter of law.  *See, e.g.*, *Jones v.*

*D.C. Water & Sewer Auth.*, 943 F. Supp. 2d 90, 93 (D.D.C. 2013) (granting employer's motion

to dismiss wrongful termination claim when employee's position was at will and employee failed

to plead the narrow "public policy" exception to the general principle of D.C. law that an

employer may discharge an at-will employee at any time and for any reason, or for no reason at

all).  The express language of Plaintiff's employment agreements establish that his chairmanship

---

[9] *See* Exhibit B.

was at will; the University's decision to remove Plaintiff from the chairmanship was therefore

GW's to make, at any time and for any reason.  Accordingly, Plaintiff's claims related to his

removal from the chairmanship must be dismissed.

      B.      <u>The University did not breach its agreement with Plaintiff when it did not increase his salary.</u>

Plaintiff's allegation that the University denied him a raise also fails to state a claim.

Plaintiff cites no provision of his contract or any other agreement between him and the

University in which he is entitled to a regular increase in salary.  This is because there is no such

agreement, in either Plaintiff's initial October 27, 2008 letter or any of the subsequent letter

agreements.[10]  Plaintiff's claim that he was entitled to a raise seems to be based on a preliminary

version of his 2013 reappointment letter, which he acknowledges in the Complaint to have been

a "draft reappointment letter" and not the final agreement.  *See* Complaint ¶48.  The most

fundamental prerequisites for Plaintiff's claim are the existence of a valid contract between the

parties and an obligation or duty arising out of that contract.  *Ajisefinni*, 17 F. Supp. 3d at 51.  A

draft letter agreement does not constitute a contract.  *See, e.g., United States v. Mahoney*, 247

F.3d 279, 285 (D.C. Cir. 2001) (noting that an enforceable contract exists only when there is an

agreement about all material terms and an intention of the parties to be bound) (citations

omitted).  Plaintiff has not identified any contractual right to an increase in salary because there

is no such right, and as such Plaintiff's claims based on the University not giving him a raise

must be dismissed.  *See, e.g., Roberson v. D.C. Bd. of Higher Ed*., 359 A.2d 28, 32 (D.C. 1976)

(where contract did not provide for step increases or automatic renewal, employer's failure to

give employee a raise did not constitute breach of contract).

---

[10] *See* Exhibits A – B.

**II.**     **Plaintiff Has Not Pled A Lack of Good Faith and Fair Dealing.**

Absent a concrete contractual breach, Plaintiff argues that GW breached an obligation of good faith and fair dealing arising under its own policies and procedures.  Notably, Plaintiff admits that he was provided all the procedural steps mandated by GW's Research Misconduct Policy.  He received adequate notice of the charges (Complaint ¶28) and full opportunities to respond to both the RIO and Committee's findings (Complaint ¶¶28, 49).  He notes that he was interviewed by the Committee and was provided with the factual basis for the Committee's conclusion (Complaint ¶28).  Plaintiff's Complaint further recognizes that the Committee did not find research misconduct on every charge.  *See* Complaint ¶41 ("The Investigation Committee concluded Dr. Kumar committed misconduct in ten of the [fourteen] allegations.").

While Plaintiff argues that the investigation was not conducted in good faith, his claims are based on the results of the investigation, not how the investigation was conducted.  He alleges:  (1) the Committee was biased and subject to a conflict of interest; (2) the Committee's findings were not supported by a preponderance of the evidence; and (3) the Committee failed to "adequately or meaningfully" address and consider Plaintiff's response in creating its Final Report.  This Court, however, should forego Plaintiff's invitation to reinvestigate the University's complex research misconduct investigation.  As the D.C. Circuit has cautioned on several occasions, "'courts should not invade, and only rarely assume academic oversight, except with the greatest caution and restraint, in such sensitive areas as faculty appointment, promotion, and tenure, especially in institutions of higher learning.'" *Allworth v. Howard Univ.,* 890 A.2d 194, 202 (D.C. 2006) (quoting *Brown v. George Washington Univ.*, 802 A.2d 382 (D.C.2002)).  A court may assess whether a university or college has substantially complied with its tenure and promotion rules, and with contract provisions, "[b]ut in determining whether a university has complied with its own rules or contract, a court must be careful not to substitute its judgment

8

improperly for the academic judgment of the school." *Id.* at 202 (citations omitted).

Furthermore, "to create triable issues of fact on [a] claim of bad faith or unfair dealing, [a

Plaintiff must] present evidence not simply of negligence or lack of diligence by the university,

but of arbitrary and capricious action on its part." *Id.* at 202.

 Even without the deference to which the University is entitled under D.C. Circuit law in

carrying out its own policies, Plaintiff's allegations improperly call for this Court to substitute

Plaintiff's judgment for the Committee's, with no factual or legal justification.  Surely, then,

*given* the requisite deference applied to the University's conduct, Plaintiff's allegations fail to

state a claim.

 A. <u>The Investigation Committee was unbiased and conflict-free.</u>

 Plaintiff asserts that the University failed to provide him with an unbiased and conflict-

free Committee, citing the Misconduct Policy's provision that "the investigation committee will

consist of at least three individuals who do not have real or apparent conflicts of interest in the

case, are unbiased, and have the necessary expertise to evaluate the evidence and issues related

to the allegations, interview the principals and key witnesses, and conduct the investigation."

Misconduct Policy § VI(C).  But this bald accusation is not supported by the events recounted in

Plaintiff's own Complaint, and is based upon Plaintiff's apparent and inaccurate assumption—

contrary to the language of the Misconduct Policy—that he is entitled to a unilateral veto over

the Committee's membership.

 First, the Complaint itself notes that the University accommodated Plaintiff's timely

objections to an initial member of the Committee.  Complaint ¶ 31.  GW's Misconduct Policy

§ VI(C) entitles a respondent to "five business days" within which he or she may object to a

member of the Committee, and the Complaint clearly acknowledges that GW afforded that

period to Plaintiff—with an extension—after it provided Plaintiff notice of the proposed

Committee members on November 8, 2013.  *See* Complaint ¶¶30-31.  However, the remainder of Section VI(C), which Plaintiff notably does not quote in his Complaint, provides that the Provost has *sole* discretion whether to dismiss a member of the committee:  "The Provost, after considering the views of the RIO, the Vice President for Research, [and] the chairs of the Executive Committee and Research Committee of the University Faculty Senate… will determine whether to replace the challenged member with a qualified substitute…."  Acting pursuant to this provision, the "Provost, after considering the views of [various University officers and employees]" exercised his discretion "to replace the challenged member with a qualified substitute," Dr. Mark J. Solomon of Yale University.  *See* Complaint ¶¶31-32.

The Provost again exercised the sole discretion expressly provided by the Misconduct Policy when Plaintiff made his second, out-of-time challenge to a Committee member.  On January 6, 2014—almost two months after the "five business day" period for objecting—Plaintiff asserted that Committee Chair Dr. Keith Crandall had a "conflict" with Plaintiff stemming from an alleged "employment relationship with a former disgruntled employee of Dr. Kumar."  Complaint ¶ 33.  Despite the untimeliness and vagueness of Plaintiff's "conflict of interest" allegation, the University followed the procedure established in Misconduct Policy § VI(C):  the University Provost's designee considered Plaintiff's objections, consulted the appropriate University officers and employees, and on January 8, 2014 exercised his discretion under the Misconduct Policy not to replace Dr. Crandall.  *See* Complaint ¶¶31-32.

The Complaint is devoid of any support for Plaintiff's allegation that any potential conflict, much less an actual one, existed between Plaintiff and the members of the Committee, the majority of whom were in fact from other universities (Yale and Kentucky).  *See* Complaint ¶32.  The plain language of the Misconduct Policy grants the Provost sole discretion whether to

grant or deny the Plaintiff's requests to have a Committee member removed.  The Complaint's

other attempt to demonstrate the Committee's bias—bare assertions that the Investigation

Committee "engaged in improper and unfair leading questioning," "misrepresented the testimony

of witnesses," "coached witnesses," and "selectively relied on a witness's statements"—are

unaccompanied by even a single iota of factual support.  *See* Complaint ¶¶38-42.  Plaintiff's

conclusory allegations do not support a claim of breach of the duty of good faith and fair dealing

and thus fail as a matter of law.  *See, e.g.*, *Howard R. L. Cook & Tommy Shaw Found. ex rel.*

*Black Employees of Library of Cong., Inc. v. Billington*, 737 F.3d 767, 772 (D.C. Cir. 2013)

(quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2008)) ("To survive the [defendant's] motion to

dismiss, plaintiffs' complaint must 'contain sufficient factual matter, accepted as true,' to

plausibly establish [the] elements" of the cause of action).

     B.    <u>The Committee's findings were supported by a preponderance of evidence and</u>
<u>the Committee considered Plaintiff's response to the Draft Investigation Report.</u>

Plaintiff's bald assertion that "the Investigation Committee's findings… were not

supported by a preponderance of the evidence," and that the Final Report "did not adequately

consider Dr. Kumar's significant comments and arguments" in response to the Draft

Investigation Report, *see* Complaint ¶¶43, 47, encapsulate the Supreme Court's admonition that

a District Court should identify "pleadings that, because they are no more than conclusions, are

not entitled to the assumption of truth" and reject those claims.  *Iqbal*, 556 U.S. at 678.

Plaintiff cites Misconduct Policy §§ VI(D)(1) and Definitions (L) in noting that

allegations of research misconduct must be "proven by a preponderance of the evidence."

Plaintiff's allegation that the Committee's Final Report failed to meet this standard, however,

lacks any factual support beyond the vague, anonymous, un-confirmable opinion of a

"Prestigious Local Institution's senior counsel and VP of Regulatory Affairs" who,

unsurprisingly, concurs in Plaintiff's disagreement with the Committee's conclusion.  *See* Complaint ¶97.  Given the absence of any factual support for this allegation, and even without the substantial deference to which the University is entitled in exercising its own policy, Plaintiff's assertion fails as a matter of law.

Plaintiff further invokes Misconduct Policy § VII(A)(1), which provides that the "final report will take into account the respondent's comments," and § VII(B), which provides that the final report "will include the actual text or an accurate summary of the views of any individual(s) found to have engaged in misconduct," yet Plaintiff provides no support for his claim that these requirements were not met beyond a bare assertion that the Final Report was "nearly identical to the Draft Investigation Report."  *See* Complaint ¶47.  Plaintiff's inference that the report did not consider his comments—an inference totally unsupported by evidence or example—is belied by the facts he does allege.  For example, Plaintiff notes that, after he submitted his comments on June 6, the Committee took almost two months to deliberate further and did not issue its Final Report until July 21, 2014.  *See* Complaint ¶¶44-45.  One can just as easily infer that, rather than ignoring Plaintiff's comments, the Committee took its time, and duly considered the comments before issuing the Final Report.[11]

C.    The University acted pursuant to its Misconduct Policy and its legal obligation to protect federal funds when it curtailed Plaintiff's ongoing research and put on hold submissions for federal grants related to that work.

Plaintiff's allegations that the University breached its obligation to him by its conduct related to Plaintiff's research activities and federal grant submissions both misstates the University's authority under the Misconduct Policy and ignores its legal obligations as a recipient of federal funds.  Plaintiff cites the Misconduct Policy's provisions regarding the

---

[11] Which is, in fact, the case: the Final Report was 24 pages longer than the Draft Investigation Report, included summaries of Plaintiff's comments and the Committee's replies thereto, and further included as an exhibit a full copy of Plaintiff's comments.

University's administrative powers for addressing allegations of research misconduct in Sections X and XI(E), *see* Complaint ¶19, but does so incompletely.  Section X actually reads, with the excluded language emphasized:

> *The university will take appropriate administrative actions against individuals* when an allegation of research misconduct has been substantiated *as determined by the Provost after consultation with the RIO.*

(emphasis added).  Section X further goes on to notes that such "actions may include… removal of the responsible person from the particular project(s)…."  Similarly, Plaintiff incorrectly interprets Section XI(E) when he claims that "interim administrative actions are *only* contemplated to protect Federal funds, protect ongoing research activities, and support the purposes of the Federal financial assistance."  Complaint ¶19 (emphasis added).  Section XI(E) does not say that interim administrative actions are *only* contemplated for the reasons articulated in that section.  In actuality, the section reads in full:  "University officials will take interim administrative actions, as appropriate, to protect Federal funds, protect ongoing research activities, and support the purposes of the Federal financial assistance."  Plaintiff's grafting of the word "only" into Section XI(E) is misleading; it makes the provision appear to be a limitation when it is, in fact, an express authorization of the University's powers to take "*interim*" action during the period between when research misconduct is alleged and an investigation reaches its final conclusions.

Read in full, then, the Misconduct Policy grants the Provost exclusive authority, upon consultation with the RIO, to undertake administrative action when the Provost determines "an allegation of research misconduct has been substantiated."  Nor does the Misconduct Policy require that formal proceedings be completed prior to the Provost taking such action, but rather it expressly authorizes "interim" actions to protect the University and federal funds.  The actions of

13

the University upon which Plaintiff bases his claims are therefore precisely the measures the University is authorized to take when addressing allegations of research misconduct.

The University received the first allegations of research misconduct from the federal government itself, which funded much of Plaintiff's research, and identified additional allegations when conducting follow up initial inquiries pursuant to the Misconduct Policy. Given these allegations—fourteen in total, and ten of which Plaintiff was found culpable—GW then exercised the authority expressly provided by the Misconduct Policy to protect the University, federal funds, and the scientific community.  Halting Plaintiff's research, which gave rise to the allegations of misconduct, is a clear exercise of the Provost's authority to "remov[e] the responsible person from the particular project" under Misconduct Policy § X.  Other actions taken by the University, such as preparing for the eventuality that Plaintiff might be removed as chair; suspending Plaintiff's access to the University laboratory associated with the research at issue; and delaying approval of Plaintiff's proposal for visiting professorships and travel to conferences, are all reasonable and necessary steps that the University was fully within its rights to take in order to avoid facilitating the continuation of, or granting the University's implicit imprimatur to, Plaintiff's activities that allegedly comprised research misconduct.

While Plaintiff may object to these measures, just as he objected to the conclusions of the investigation as a whole, these steps nonetheless fall clearly within the University's authority under the Misconduct Policy.  Like Plaintiff's allegations that the investigation failed to follow the University's policies and procedures, his allegations that the University breached its policies or procedures, or acted in bad faith, via its prophylactic and remedial actions related to allegations of research misconduct are mere conclusion, without merit, and run contrary to the University's actual authority under its policies.

Plaintiff's allegations that the University breached its policies and procedures concerning

its processing of federal grant submissions lack merit for the same reason.  In addition, they

misstate the University's rights and obligations with respect to federal grants.  Grants from the

National Institutes of Health ("NIH") "are governed by statute, not contract law."  *Tavoloni v.*

*Mount Sinai Med. Ctr.*, 26 F. Supp. 2d 678, 683 (S.D.N.Y. 1998) (collecting cases).  NIH

policies and rules, and case law interpreting those policies and rules, make clear that grants such

as those underlying Plaintiff's allegations belong to the University as grantee, and a Principal

Investigator such as Plaintiff "is not a party to the contract and, indeed, had no property interest

in the [NIH] Grant."  *Al-Hendy v. Meharry Med. College*, No. 3:11-1201, 2014 WL 3853839, at

*19 (M.D. Tenn. Aug. 6, 2014); *see also Kalderon v. Finkelstein*, 2010 WL 9488933, at *13-14

(S.D.N.Y. Mar. 10, 2010), *rev'd in part on other grounds*, 2010 WL 3359473 (S.D.N.Y. Aug.

25, 2010) *aff'd*, 495 F. App'x 103 (2d Cir. 2012)  ("That a PI does not have a property interest in

a grant is made clear by the governing regulations and the limited relevant case law that exists.

It is the grantee institution (the College), and not the PI, that is the legal recipient of the grant.").

As grantee, it is therefore entirely the University's decision whether to relinquish or

retain grants, as well as whether to approve submissions to NIH.  It further is the University's

responsibility in so doing to ensure that all NIH regulations are followed, that the research is

sound, and that federal funds are safeguarded from potential misuse.  NIH Grants Policy

Statement § 2.3.6, "Legal Implications of Applications," makes this obligation clear:

> The signature of an [Authorized Organization Representative] on the
> application certifies that the organization will comply with all applicable
> assurances and certifications referenced in the application…The
> [Authorized Organization Representative's] signature further certifies that
> the applicant organization has the ability to provide appropriate
> administrative and scientific oversight of the project and *agrees to be fully*
> *accountable for the appropriate use of any funds awarded and for the*
> *performance of the grant-supported project or activities resulting from the*

15

*application.*[12]

(emphasis added).  Because of that obligation, the Misconduct Policy expressly permits the

University to take action—including interim action—at the Provost's discretion to "protect

Federal funds, protect ongoing research activities, and support the purposes of the Federal

financial assistance."  Misconduct Policy § XI.

Two of the federal grants that Plaintiff alleges were improperly delayed or relinquished

by the University in violation of its policies—CA98823-11A1 and CA90970, *see* Complaint

¶¶66-71—funded research that gave rise to allegations of research misconduct.  Contrary to

violating its policies and procedures, the University acted expressly in accordance with those

policies and procedures, and also in accordance with its status as grantee and its concurrent

obligation to NIH, by taking steps to safeguard those and other federal grants from potential

further misuse by delaying submissions for two grants and relinquishing the third.  In short,

Plaintiff has failed to plead that the University violated its policies with respect to the NIH

grants, and his claims related to those grants must be dismissed.

> D.   <u>Plaintiff's allegations that the University disclosed confidential information
> concerning the misconduct proceedings are pure conjecture and insufficient to
> state a claim.</u>

Plaintiff's allegation that the University disclosed confidential information related to the

investigation because certain allegations were mentioned in anonymous blog posts is pure

conjecture on Plaintiff's part and ignores that such information was already known to others and

had already been made public on the Internet before the investigation even began.

To sufficiently plead a claim and survive a motion to dismiss, Plaintiff has an "obligation

to provide the grounds of his entitlement to relief [consisting of] more than labels and

---

[12] NIH Grants Policy Statement (Oct. 2013), *available online at*
http://grants.nih.gov/grants/policy/nihgps_2013/nihgps_ch2.htm#appl_legal_implications (last accessed March 31,
2015).

conclusions... Factual allegations must be enough to raise a right to relief above the speculative

level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotations omitted). In stark

contrast to this requirement, Plaintiff's allegations are purely speculative and therefore must be

dismissed. The Complaint's allegation that "an anonymous source privy to confidential

information about the GW inquiry released the confidential information to the online blog

*RetractionWatch.com*" because an anonymous commenter asserted that "ORI knows about" the

allegations, *see* Complaint ¶¶22-24, is premised entirely upon Plaintiff's presumption that the

information must have come from the University. This Court should not accept such an

inference, for which Plaintiff offers no factual basis and which is, in fact, belied by reality. *See,

e.g., Hodges v. Gov't of District of Columbia*, 975 F. Supp. 2d 33, 42, (D.D.C. 2013) ("[T]he

Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by

facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions.").

Plaintiff's own Complaint characterizes the leak as from an "anonymous source"

(Complaint ¶¶22-24); Plaintiff pleads no facts identifying the source as the University or anyone

connected to the University. As for Plaintiff's inference that the information must have come

from the University, such a conclusion completely ignores that the information had already been

made public by an anonymous poster on another blog. The March 2013 postings on

*RetractionWatch.com* identified in the Complaint[13] contain the same allegations of fabrication

and data falsification with respect to the same two papers co-authored by Plaintiff that had been

---

[13] Those identified in the Complaint are a posting time-stamped March 12, 2013, 3:05PM, as a "Reply" in the "Comments" section to http://retractionwatch.com/2013/03/12/another-win-for-transparency-jbc-takes-a-step-forward-adding-details-to-some-retraction-notices/; a posting time-stamped March 19, 2013, 2:12PM, in the "Comments" section to http://retractionwatch.com/2013/03/18/u-wisconsin-neuroscientist-who-faked-images-has-first-paper-retracted/; a posting time-stamped March 20, 2013, 1:58PM, as a "Reply" in the "Comments" section to http://retractionwatch.com/2013/03/18/u-wisconsin-neuroscientist-who-faked-images-has-first-paper-retracted/; and a posting time-stamped March 23, 2013, 2:38PM, as a Reply in the "Comments" section to http://retractionwatch.com/2013/03/18/u-wisconsin-neuroscientist-who-faked-images-has-first-paper-retracted/. *See* Complaint ¶¶23-24.

made three months earlier, in December 2012, on another public website, *Science-Fraud.org*.[14]
In fact, it was this earlier 2012 posting on *Science-Fraud.org* that led the University's RIO to
recommend that four new allegations be added to the investigation.[15]

In short, Plaintiff not only has failed to provide any support for his bare assertion that the
University leaked confidential information, but the circumstances that gave rise to the
investigation in the first place  show that the truth is otherwise.  Plaintiff's allegation that the
University leaked confidential information is purely speculative and insufficiently pled to
support his claims, and therefore must be dismissed.

## III.     Plaintiff Fails to Adequately Plead that the University's Treatment of His Grants Tortiously Interfered with Plaintiff's Business Relations.

Plaintiff alleges that the University's delay with respect to submissions for two federal
grants related to Plaintiff's research and its relinquishment of a third grant tortiously interfered
with Plaintiff's business relations, namely seeking employment with another institution.  Plaintiff
has not pled, however, that the University's actions with respect to the grants—two of which, as
noted above, funded research that was the subject of allegations of research misconduct—were at
all improper or were intended to interfere with any business relationship.  Plaintiff has thus failed
to state a claim for tortious interference.

Under D.C. law, "[t]o make out a prima facie case of intentional interference with
business relations, the plaintiff must prove: (1) existence of a... business relationship; (2) the

---

[14] *Science-Fraud.org* was the then-anonymous blog of Paul S. Brookes, Ph.D., a research scientist at the University of Rochester (NY), where, between July and December of 2012, numerous instances of apparent data irregularities in the life sciences literature were reported.  Dr. Brookes shut down the blog in January 2013 after he was "outed" as the blogger, but the page containing allegations involving Plaintiff and the two papers is available through the "Wayback Machine" Internet Archive:  "Will ASBMB's new integrity officer have teeth?," (posted Dec. 10, 2012), *available at* https://web.archive.org/web/20121217021721/http://www.science-fraud.org/ (snapshot taken Dec. 17, 2012).

[15] In addition, eight of the fourteen allegations ultimately investigated by the Committee originated from anonymous complainants reporting to ORI on at least two occasions, proving that at least one other person knew both the substance of allegations regarding Plaintiff's research misconduct and that such allegations had been reported to ORI.

defendant's knowledge of the relationship; (3) intentional interference with that relationship by the defendant; and (4) resulting damages." *Onyeoziri v. Spivok*, 44 A.3d 279, 286 (D.C.  2012); *see also Furash & Co. v. McClave*, 130 F. Supp. 2d 48, 56 (D.D.C. 2001).  Interference must be "intentional and improper," *McClave*, 130 F. Supp. 2d at 56, (quoting *Carr v. Brown*, 395 A.2d 79, 84 (D.C.1978)).  A "[p]laintiff cannot establish liability without a strong showing of intent to disrupt ongoing business relationships; a general intent to interfere or knowledge that conduct will injure the plaintiff's business dealings is insufficient to impose liability." *Bannum, Inc. v. Citizens for a Safe Ward Five, Inc.*, 383 F. Supp. 2d 32, 45 (D.D.C. 2005) (quotations omitted).

Plaintiff alleges that the University did not approve his submissions to NIH related to two of the grants, and that it relinquished the third, because it knew he was in negotiations for employment with another institution.  The timeline established in the Complaint, however, notes that the University made the decision to place Plaintiff's submissions to NIH on hold well before Plaintiff engaged in those negotiations; the University therefore could not have acted with intent to disrupt a business relationship.  Specifically, the Complaint states that, after receiving the Committee's initial determination in June 2014 that Plaintiff had engaged in research misconduct, the Provost notified Plaintiff on July 18, 2014, that the University would not approve Plaintiff's grant submissions to NIH until the Provost and Plaintiff met to discuss the Final Report.  Complaint ¶69.  The Complaint further states that Plaintiff did not "commence[] discussions with the [other] institution [until] August 2014."  Complaint ¶96.  By his own timeline, Plaintiff shows that the University's conduct with respect to the grants began prior to the "existence of a... business relationship."  Based solely on the allegations in the Complaint, it is impossible that the University's decision in July to put on hold submissions for grants that funded or would fund Plaintiff's research could have been made with "knowledge" of a business

relationship that did not exist until a month later.

In addition, as noted above, the federal grants at issue belonged or would have belonged to the University as the grantee institution, and Plaintiff, even as Principal Investigator, had no rights to the grants. *See, e.g., Al-Hendy v. Meharry Med. College*, 2014 WL 3853839, at *19. Plaintiff acknowledges the University's exclusive rights over the grant in his Complaint, noting, for example, that "NIH, the grantor of one of the grants, required response from GW regarding whether *GW would accept* a newly awarded five-year grant on Dr. Kumar's behalf." *See* Complaint ¶99 (emphasis added).  Not only did the University have full rights with respect to the grants, including whether to make submissions to NIH or hold, accept, or relinquish grants back to the federal government, but it further had an obligation to ensure the security of federal funds and the propriety of activities conducted using those funds.  The University therefore had full discretion to refuse to place its imprimatur on Plaintiff's research by accepting grants on his behalf.  In fact, by refusing the grants, the University was judiciously protecting itself from legal risk.  If it had accepted the grants, the University would have been required by the federal government to "*agree[] to be fully accountable for the appropriate use of any funds awarded and for the performance of the grant-supported project or activities resulting from the application*."[16]  Given the University's legal obligation to the federal government and the initial determination of the Committee that Plaintiff engaged in research misconduct, Plaintiff's allegation that the University acted improperly by holding or relinquishing grants, for which it would have been fully responsible, is untenable.[17]

---

[16] NIH Grants Policy Statement § 2.3.6, *see* n.12, *supra*.

[17] In addition, the University has an affirmative defense in that a defendant "may avoid liability if he can establish that his conduct was legally justified or privileged, for example, in order to protect a present, existing economic interest."  *Onyeoziri v. Spivok*, 44 A.3d at 286-87 (quotations omitted).  "In determining whether conduct that allegedly rose to intentional interference was improper or legally justified, finders of fact must weigh seven factors, including '(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the

## IV.    Plaintiff's Claims for Invasion of Privacy and False Light Are Time-Barred and Lack Sufficient Support.

Plaintiff's allegations that the University tortiously invaded his privacy and placed him in false light are both time-barred.  In addition, such claims are insufficiently pled.  As noted above, Plaintiff failed to provide any support for his bare assertion that the University leaked confidential information, and the circumstances of the investigation show that the truth is otherwise.

Plaintiff filed the Complaint on January 23, 2015.  He based his claims on allegations that the University leaked confidential information related to the investigation by March 12, 2013, as information regarding two of the publications subject to allegations of research misconduct by the Plaintiff appeared on the blog *RetractionWatch.com* on that date.[18]  Complaint ¶¶22-24.  In D.C., "'[i]nvasion of privacy is not one tort, but a complex of four, each with distinct elements and each describing a separate interest capable of being invaded.'  The four constituent torts are: "(1) intrusion upon one's solitude or seclusion ['intrusion']; (2) public disclosure of private facts ['public disclosure']; (3) publicity that places one in a false light in the public eye ['false light']; and (4) appropriating one's name or likeness for another's benefit ['appropriation']."  *Greenpeace, Inc. v. Dow Chem. Co.*, 97 A.3d 1053, 1061-62 (D.C. 2014) (quoting *Wolf v.*

---

actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties.'"  *Armstrong v. Thompson*, 80 A.3d 177, 191 (D.C. 2013) (quoting *Onyeoziri*, 44 A.3d at 291).  Not only was the University acting entirely within its rights and pursuant to its obligations with respect to the grants, but every factor of this test weighs in the University's favor.  The University held and relinquished grants that belonged or would have belonged to it, and it alone; its motivation in doing so was the protection of federal funds and scientific research; Plaintiff had no interest in the grants; social interest weighs substantially in favor of allowing a university to fulfill its obligations to federal agencies supplying grants; Plaintiff cannot show that the University's conduct with respect to the grants caused him not to be offered the position; and Plaintiff had sought the grants through the University and in the University's name.

[18] As noted above, those allegations actually appeared three months earlier on another public website, *Science-Fraud.org*, *see* n.14, *supra*.

*Regardie*, 553 A.2d 1213, 1216–17 (D.C.1989)).[19]  All such claims are "subject to the one-year

statute of limitations applicable 'for libel, slander, assault, battery, mayhem, wounding,

malicious prosecution, false arrest or false imprisonment.'"  *Greenpeace, Inc.*, 97 A.3d at 1062

(quoting D.C. Code § 12-301(4)).[20]

"Invasion of privacy is essentially a defamation type action."  *Doe v. Southeastern Univ.*,

732 F. Supp. 7, 8 (D.D.C. 1990) (citing *Wolf v. Regardie*, 553 A.2d 1213 (D.C.1989)).

"Defamation occurs on publication, and the statute of limitations runs from the date of

publication."  *Mullin v. Washington Free Weekly, Inc.*, 785 A.2d 296, 298 (D.C. 2001) (quoting

*Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 882 (D.C.1998)).  Because the

Complaint was not filed until almost two years after the Plaintiff alleges the University must

have leaked confidential information regarding the investigation, the claims for false light and

invasion of privacy are time-barred and must be dismissed.

In addition, as noted above, Plaintiff's allegations that the University leaked confidential

information are purely speculative and insufficiently pled to support his claims.  The Complaint

does not plead any fact that actually connects the alleged leak to the University, and the

investigative facts show that the confidential information supposedly disclosed by the University

was known to others, made public on another website, and in fact formed part of the basis for the

investigation in the first instance.  For Plaintiff's allegations to survive a motion to dismiss, he

must first meet the minimum burden of showing, beyond a merely speculative level, that the

University was responsible for the leak.  *See, e.g.*, *McCaskill v. Gallaudet Univ.*, 36 F.Supp.3d

---

[19] Of this list, the claim in Plaintiff's Complaint for "invasion of privacy" that the University "disclosed confidential information concerned the misconduct proceeding" apparently is intended to claim "public disclosure of private facts."  *See* Complaint ¶130.

[20] In *Greenpeace*, the D.C. Court of Appeals expressly rejected the argument that the four "invasion of privacy" torts should be subject to different limitations periods and held the one-year period applied to all.  *Id.* at 1062.

145, 158 (D.D.C. 2014) (dismissing defamation and false light claims against a university

because plaintiff did not show "that the defendant made a statement at all.").  Plaintiff has failed

here to show "that the defendant made a statement at all," and thus his invasion of privacy and

false light claims must be dismissed.

## CONCLUSION

For the reasons set forth above, this Court should dismiss Plaintiff's Complaint with

respect to all claims.

Respectfully submitted,

/s/  Barbara Van Gelder
Barbara Van Gelder (DC Bar No. 265603)
Christopher J. Allen (DC Bar No. 976426)
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, DC  20006-5403
Telephone:  (202) 420-4845
Facsimile:   (202) 420-2201
vangelderb@dicksteinshapiro.com
allenc@dicksteinshapiro.com

*Counsel for Defendant George Washington University*

Dated:  April 2, 2015

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 2d day of April, 2015, a copy of the foregoing

Memorandum of Points and Authorities in Support of Defendant's Motion to Dismiss was

electronically filed via the Court's CM/ECF system.


/s/   Christopher J. Allen_____
Christopher J. Allen (DC Bar No. 976426)
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, DC  20006-5403
Telephone:  (202) 420-3324
Facsimile:  (202) 420-2201
allenc@dicksteinshapiro.com