**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

RAKESH KUMAR,

    Plaintiff,

      v.

GEORGE WASHINGTON UNIVERSITY,

    Defendant.

Civil Action No. 15-120 (JDB)

## MEMORANDUM OPINION

Plaintiff Dr. Rakesh Kumar, a professor of biochemistry and molecular medicine, brings suit against his employer George Washington University ("GW" or "the university"), alleging that the university improperly handled its investigation into his suspected research misconduct. The university's motion to dismiss on the ground of official immunity succeeds in disposing of Kumar's claim for tortious interference with business relations, but there is no immunity as to his other four claims. And his tortious invasion of privacy claims must be dismissed for failure to state a claim. But the university's motion to dismiss will be denied in part because Kumar has pled sufficient facts to state a claim for breach of contract and breach of the implied covenant of good faith and fair dealing.

## BACKGROUND

The university's inquiry into Kumar's alleged research misconduct began in late 2012 when the federal Office of Research Integrity ("ORI") received anonymous allegations of scientific research misconduct against Kumar and transmitted those allegations to GW for review. First Am. Compl. [ECF No. 11] ¶ 17. In December 2012, GW notified Kumar that it had decided

to open a formal inquiry into the allegations.  Id.  After a lengthy investigation process that included a draft inquiry report, a final inquiry report, witness interviews, and a draft investigation report, the university in July 2014 issued its final investigation report finding misconduct.  As a result of the misconduct finding, the university took several actions against Kumar including the (1) removal of Kumar from his position as Department Chair, id. ¶ 73; (2) relinquishment of a federal grant, which had previously funded Kumar's research, id. ¶ 85; (3) replacement of Kumar as the supervisor of a Ph.D. candidate, id. ¶ 96; and (4) closure of Kumar's laboratory and office, id. ¶ 103.

Kumar alleges that the university's inquiry and investigation processes were fraught with unfairness and, more importantly, were improper under the university's research misconduct policy and D.C. law.  He asserts five claims against the university: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) tortious interference with business relations; (4) tortious invasion of privacy (public disclosure of private facts); and (5) tortious invasion of privacy (false light).  The university has responded with two motions to dismiss.  One asserts that this case must be dismissed for lack of subject-matter jurisdiction as a result of the university's Westfall immunity.[1]  Def.'s 12(b)(1) Mot. to Dismiss [ECF No. 18].  The other seeks

---

[1] While styled as a motion to dismiss for lack of subject-matter jurisdiction, GW's filings do not provide any explanation of why this type of immunity would deprive the Court of subject-matter jurisdiction.  The Court has found no D.C. Circuit or Supreme Court decisions suggesting that common-law absolute immunity is jurisdictional.  (And it is worth noting that over the past decade the Supreme Court has repeatedly warned against carelessly dubbing issues "jurisdictional."  See, e.g., Sebelius v. Auburn Reg'l Med. Ctr., 133 S. Ct. 817, 824–25 (2013); Henderson ex rel. Henderson v. Shinseki, 562 U.S. 428, 434–36 (2011); Arbaugh v. Y&H Corp., 546 U.S. 500, 510 (2006).)  Rather, courts treat official immunity as "an affirmative defense" justifying dismissal under Rule 12(b)(6), not Rule 12(b)(1).  Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 75 (2d Cir. 1998); see Mangold v. Analytic Servs., Inc., 77 F.3d 1442, 1444 (4th Cir. 1996) (referring to the "defense of absolute immunity"); Bakhtiari v. Beyer, No. 4:06-CV-1489 (CEJ), 2009 WL 877884, *7 (E.D. Mo. Mar. 30, 2009) (same). The Court will therefore treat GW's purported immunity as a defense on the merits, not a limit on the Court's jurisdiction.

to dismiss all five counts of Kumar's complaint for failure to state a claim.  Def.'s 12(b)(6) Mot.

to Dismiss [ECF No. 8].

## ANALYSIS

### I.  **Westfall** Immunity

The university's 12(b)(1) motion to dismiss raises a novel question for the Court: whether

a non-governmental entity such as George Washington University, which engages in research

misconduct investigations pursuant to the Public Health Services Act, is entitled to absolute

immunity from state-law tort claims pursuant to the doctrine of official immunity.  The question

sounds at first like an open-and-shut case: what could "official" immunity have to do with a private

university?  But the label "official" is not as narrow as it first sounds.

### A.  **Whether the university was delegated a governmental function**

Official immunity attaches "to particular official functions, not to particular offices."

Westfall v. Erwin, 484 U.S. 292, 296 n.3 (1988).  A principal purpose of official immunity is to

prevent "disruption of governmental functions" by providing immunity to those "official

function[s] [that] would suffer under the threat of prospective litigation."  Id.  And when private

entities perform "government functions," "there is obviously implicated the same interest in

getting the Government's work done."  Boyle v. United Techs. Corp., 487 U.S. 500, 505 (1988).

"[T]he same policy considerations that justify immunity for government employees can apply with

equal force to private actors when they are charged with implementing government policies."

Murray v. Northrop Grumman Info. Tech., Inc., 444 F.3d 169, 175 (2d Cir. 2006).  Hence, Courts

have extended immunity to non-governmental entities when they are performing "official" or

"governmental" functions.  Mangold v. Analytic Servs., 77 F.3d 1442, 1446–48 (4th Cir. 1996)

(extending immunity to private sector government contractors participating in official investigations of government contracts).

To decide whether GW is entitled to official immunity, the Court must first determine whether the university was performing a governmental function when it investigated Kumar's alleged research misconduct.  Certain functions, like the detention of individuals charged with committing crimes, are unquestionably governmental.  See Viehdeffer v. Tryon, No. 12-CV-23S, 2012 WL 3746372, at *12 (W.D.N.Y. Aug. 28, 2012).  But "[n]ot every activity in which government might decide to engage is a function of government in private hands."  Houston Cmty. Hosp. v. Blue Cross and Blue Shield of Tex., 481 F.3d 265, 271 (5th Cir. 2007).  And deciding whether to label an activity as "governmental" is hardly a precise science.  Courts look to whether the activity is "critical to the efficient conduct of government," Mangold, 77 F.3d at 1447, as well as whether the activity "aligns with traditionally protected . . . function[s] of government," Houston Cmty. Hosp., 481 F.3d at 276.  This is not a particularly limiting set of criteria, despite the Supreme Court's "sparing . . . recognition of claims to absolute official immunity."  Forrester v. White, 484 U.S. 219, 224 (1988).

This case, fortunately, does not require the Court to tread entirely new ground in deciding whether a function is governmental.  Here, Kumar's lawsuit arises out of the university's inquiry, investigation, and report of Kumar's alleged misconduct in the course of federally funded research.  Among the most frequently immunized "government functions" are the investigation of fraud in a government program and the reporting of information to the government pursuant to a federal duty.  See Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 73 (2d Cir. 1998) ("The investigation and reporting of possible Medicare fraud is precisely the type of delegated discretionary function that the public interest requires to be protected by immunity."); Mangold, 77 F.3d at 1447

(extending immunity to "government contractors participating in official investigations of government contracts"); <u>Slotten v. Hoffman</u>, 999 F.2d 333, 335 (8th Cir. 1993) ("When private parties are under a mandatory duty to supply [information necessary to execute governmental functions], they are entitled to the government's official immunity."); <u>Nu-Air Mfg. Co. v. Frank B. Hall & Co. of N.Y.</u>, 822 F.2d 987, 995 (11th Cir. 1987) (recognizing the appropriate extension of immunity when it serves the "paramount" government purpose of "uncovering fraud in government programs"). Therefore, if the university has been delegated the responsibility to investigate fraud in the use of federal funds, it is performing a well-established government function.

Government functions can be delegated to private entities by way of legislation and regulations. <u>See</u> <u>Murray</u>, 444 F.3d at 175–76 ("The DOS and INS delegated responsibility to NGIT to administer an international program under the United States' immigration laws."); <u>Pani</u>, 152 F.3d at 73–74 (holding that fiscal intermediaries were "carrying out a traditional government function" when investigating and reporting Medicare fraud as required by federal regulations); <u>Kwoun v. Se. Mo. Prof'l Standards Review Org.</u>, 811 F.2d 401, 406–07 (8th Cir. 1987) (holding private actors were performing a government function when "participating in a review process established and governed by federal law"); <u>Bakhtiari v. Beyer</u>, No. 4:06-CV-1489 (CEJ), 2009 WL 877884, at *7–8 (E.D. Mo. Mar. 30, 2009) (holding university official had been delegated a government function pursuant to federal immigration regulations). Here, the university argues that it was delegated a government function under the Public Health Service Act (PHSA) and its implementing regulations. The Court agrees.

The PHSA was amended in 1985 by the Health Research Extension Act, which allows the U.S. Department of Health and Human Services (HHS) to "provide National Research Service

Awards for . . . biomedical and behavioral research and health services researc[h] . . . at public and nonprofit private entities."  Pub. L. No. 99-158, § 487(A)(iii), 99 Stat. 820, 869 (codified as amended at 42 U.S.C. § 288).  The amendment also directed HHS to "make grants to public and nonprofit private institutions to enable such institutions to make National Research Service Awards" for biomedical and behavioral research "to individuals selected by such institutions." § 487(B), 99 Stat. at 869.

The Act then created a separate section, codified as amended at 42 U.S.C. § 289b, for the protection against scientific fraud.  § 493, 99 Stat. at 874–75.  Section 289b requires that institutions applying for financial assistance under the Act have in place administrative processes for reviewing reports of research misconduct as a condition of funding for research.  42 U.S.C. § 289b(b)(1).  Also as a condition of funding, those institutions must agree to report "any investigation of alleged research misconduct in connection with projects for which funds have been made available under this chapter that appears substantial."  42 U.S.C. § 289b(b)(2).

In 1993, Congress amended Section 289b to establish the Office of Research Integrity to address research integrity and misconduct issues related to PHS-supported activities.  National Institutes of Health Revitalization Act of 1993, Pub. L. No. 103-43, § 493, 107 Stat. 122, 140–41. The Secretary of HHS was directed to establish a process, to be followed by ORI, to respond to information "respecting research misconduct in connection with projects for which funds have been made available under this chapter"; receive reports "of such information from recipients of funds"; "conduct investigations"; and take "other actions, including appropriate remedies, with respect to such misconduct."  42 U.S.C. § 289b(c).  ORI was also charged with monitoring the institutions' administrative processes and investigations.  Id. § 289b(d).  The grant of responsibility to ORI to conduct research investigations as well as the requirement that institutions report such

investigations back to ORI indicates that the investigation of research misconduct is a government function.

The implementing regulations, promulgated in 2005, confirm the delegation of responsibility from HHS to the research institutions. "HHS has ultimate oversight authority for PHS supported research, and for taking other actions as appropriate or necessary, including the right to assess allegations and perform inquiries or investigations at any time." 42 C.F.R. § 93.100(b). HHS "has delegated responsibility for addressing research integrity and misconduct issues related to PHS supported activities" to ORI. Id. § 93.217. "Institutions and institutional members have an affirmative duty to protect PHS funds from misuse by ensuring the integrity of all PHS supported work, and primary responsibility for responding to and reporting allegations of research misconduct . . . ." Id. § 93.100(b) (emphasis added).

The regulations put in place specific procedures to implement this delegation of authority. For example, when ORI receives an allegation of research misconduct it has the option to conduct an allegation assessment itself, id. § 93.400(a)(1), or it may refer the matter to the "appropriate institution or HHS component for inquiry or investigation," id. § 93.400(a)(3). If ORI forwards the matter to an institution, the institution must respond to the allegation of research misconduct in accordance with policies and procedures that conform to the regulatory requirements. See id. §§ 93.300(a), (b), 93.301(b), 93.304. Throughout the investigation, the institution must report back to ORI. Id. § 93.304(d) (requiring institutions to provide "[w]ritten notice to ORI of any decision to open an investigation"); id. 93.304(i) (requiring institutions to provide notice to ORI "of any facts that may be relevant to protect public health, Federal funds and equipment, and the integrity of the PHS supported research process"). And at the conclusion of the investigation, the institution must give ORI a copy of the investigation report, inform ORI whether the institution

found misconduct and if so, who committed the misconduct, and, finally, describe any pending or completed administrative actions against the respondent.  Id. § 93.315.  It is hard to see this regulatory scheme as anything less than the deputizing of research institutions to serve "as adjuncts to the government," Pani, 152 F.3d at 74, in investigating research misconduct on behalf of ORI and by extension HHS.

The conclusion that universities have been delegated a government function by the PHSA and its implementing regulations finds further support in the common federal policies on research misconduct issued by the Office of Science and Technology Policy (OSTP).  In the policy, cited by both parties, the OSTP addressed the question: "Why don't the Federal agencies conduct all inquiries and investigations?"  The Office responded:

> Research institutions are much closer to what is going on in their own institutions and are in a better position to conduct inquiries and investigations than are the Federal agencies. While the Federal agencies could have taken on the task of investigating all allegations of research misconduct, or established a separate agency for this purpose, this would have involved a substantial new Federal bureaucracy, which is not thought desirable.

Federal Policy on Research Misconduct, 65 Fed. Reg. 76,260, 76,262 (Dec. 6, 2000).  The candid reply by OSTP provides context to the delegation of authority in the PHSA.  There is a recognized government interest in "the health and safety of the public," "the integrity of research," and "the conservation of public funds."  42 C.F.R. § 93.100(a).  Protecting those interests requires an apparatus for the investigation of research misconduct allegations.  Rather than create a "new Federal bureaucracy," HHS decided that the "primary responsibility" for this otherwise governmental function would fall to the institutions receiving federal funds.  42 C.F.R. § 93.100(b).

Having determined that universities have been delegated a governmental function, the Court still must pause to consider "whether the contributions of immunity to effective government

. . . outweigh the perhaps recurring harm to individual citizens." Doe v. McMillan, 412 U.S. 306, 320 (1973). Courts extend official immunity where the threat of liability "might appreciably inhibit the fearless, vigorous, and effective administration of policies of government." Barr v. Matteo, 360 U.S. 564, 571 (1959). It is clear that research institutions are "in a unique position" to protect the government interest in research integrity and the conservation of federal funds. See Pani, 152 F.3d at 73. The protection of these interests "would be thwarted if these non-government entities . . . were to find themselves facing damage suits" for vigorously responding to allegations of research misconduct. Id. Extending official immunity will contribute "to effective government" by ensuring that universities are not "unduly timid" in carrying out their obligation to investigate research misconduct. See Westfall, 484 U.S. at 295–96 (internal quotation marks omitted). In this context, official immunity "is justified." See id. at 295.

Kumar's arguments to the contrary are unpersuasive. Kumar first argues that official immunity cannot exist because OSTP and HHS "both have stated that, in the absence of a legislative or regulatory initiative to put . . . immunity into place, there is no such immunity." Pl.'s Opp'n to Def.'s 12(b)(1) Mot. to Dismiss [ECF No. 20] at 3–4 (Pl.'s 12(b)(1) Opp'n) (citing Public Health Service Policies on Research Misconduct, 70 Fed. Reg. 28,370, 28,380 (May 17, 2005) and Federal Policy on Research Misconduct, 65 Fed. Reg. at 76,261). It is true that in response to the question, "Should HHS take action to provide immunity from personal liability for institutions . . . who participate in research misconduct proceedings?" HHS replied: "[A] Federal statute, rather an HHS regulation, would be needed to provide this immunity." 70 Fed. Reg. at 29,380. And there is similar language in the OSTP's notification of final policy. 65 Fed. Reg. at 76,261. But even in the "absence of legislation specifically immunizing" research institutions from liability for defective research misconduct investigations, there may still be a "basis for judicial recognition of

such a defense." <u>Boyle</u>, 487 U.S. at 504.  The Court's assessment of official immunity under federal common law is not constrained by these agency comments.

The remainder of Kumar's opposition boils down to the premise that research institutions are not performing a governmental function when conducting research misconduct investigations because there is no "legal authority establishing that ORI was tasked with the primary responsibility of conducting investigations of research misconduct occurring at private universities."  Pl.'s 12(b)(1) Opp'n at 9.  In other words, according to Kumar, because private institutions—not ORI—were granted "primary responsibility" for misconduct investigations, the conduct cannot be governmental.  But Kumar misunderstands the governmental function inquiry. The question is not whether some government entity was originally responsible for the conduct, but rather whether the function itself is governmental in nature.  And as explained above, the investigation of misuse of federal funds pursuant to a government mandate and in order to report such misconduct back to the overseeing government entity is a decidedly governmental function. Furthermore, even taking Kumar's argument on its terms, ORI <u>was</u> granted authority to conduct investigations.  <u>See</u> 42 U.S.C. § 289b(c)(3); 42 C.F.R § 93.217.  In sum, the Court concludes that research misconduct investigations conducted pursuant to the PHSA are a government function that has been delegated to private institutions.

**B. Whether the university's conduct is immune from suit under <u>Westfall v. Erwin</u>**

Not all conduct related to a delegated government function, however, is protected by absolute immunity.  Conduct is protected by absolute immunity when the conduct is within the scope of official duties and discretionary in nature.  <u>Westfall</u>, 484 U.S. at 297–98.  This test has been superseded as to federal employees by the Federal Employees Liability Reform and Tort Compensation Act.  <u>Beebe v. Wash. Metro. Area Transit Auth.</u>, 129 F.3d 1283, 1289 (D.C. Cir.

1997).  But Westfall "remains the framework for determining when nongovernmental persons or entities are entitled to [official] immunity."  Pani, 152 F.3d at 72; see Beebe, 129 F.3d at 1289 ("Westfall remains the common law rule.").

Because Westfall immunity is immunity from state-law tort claims—not contract claims, see 484 U.S. at 295—Kumar's claims for breach of contract and breach of the covenant of good faith and fair dealing survive the university's immunity defense.  The Court, thus, need only apply the Westfall test to Kumar's claim for tortious interference with business relations (Count III) and his two claims for tortious invasion of privacy (Counts IV and V).

In doing so, the Court must look carefully at "each challenged act" to determine whether the particular conduct alleged is immune from suit under this test.  Banneker Ventures, LLC v. Graham, 798 F.3d 1119, 1141 (D.C. Cir. 2015).  Kumar's claim of tortious interference with business relations is based on the allegation that "GW relinquished [his] grants with the understanding that doing so would make [another institution] significantly less interested in hiring [him]."  First Am. Compl. ¶ 139; see id. ¶¶ 114–15.[2]  Kumar alleges two factual bases that supposedly support his tortious invasion of privacy claims.  "GW disassociated Dr. Kumar from his student's dissertation" by introducing another scientist as the student's thesis advisor at the student's public defense of her dissertation work.  First Am. Compl. ¶ 147.  And "GW publicly humiliated Dr. Kumar when it had him escorted out of his laboratory by a security guard and told all of his scientists to leave the lab."  Id. ¶ 148.[3]

---

[2] The university returned the grant to NIH in September 2014 after concluding in its final report that Kumar had engaged in research misconduct.  First Am. Compl. ¶ 71.

[3] Kumar also based his invasion of privacy claims on the university's improper disclosure of confidential information.  First Am. Compl. ¶ 145.  But he has effectively abandoned any claim based on this conduct.  See Pl.'s Opp'n to Def.'s 12(b)(6) Mot. to Dismiss [ECF No. 12] at 38–41 (Pl.'s 12(b)(6) Opp'n) (arguing that it is his disassociation from his student's thesis and his being escorted from his lab by

The alleged conduct is immune from suit only if it was within the scope of the university's official duties, meaning among the "'matters committed by law to [the university's] control or supervision.'" Graham, 798 F.3d at 1141 (quoting Barr, 360 U.S. at 573). Kumar argues that the challenged conduct was taken "outside of the [misconduct] investigation," and therefore outside the scope of the university's delegated function. Pl.'s 12(b)(1) Opp'n at 25. Kumar's point has merit. "At a high enough level of generality, almost any act that has any relationship to an overarching duty, such as the duty [to investigate and report allegations of research misconduct], will be immunized." Graham, 798 F.3d at 1141. The relationship between the core duty to investigate and report research misconduct and the university's subsequent disciplinary decisions is not particularly close.

But nor is the "official duties" inquiry particularly demanding. The challenged actions must simply "bear some reasonable relation to and connection with [the defendant's] duties and responsibilities." Ramey v. Bowsher, 915 F.2d 731, 734 (D.C. Cir. 1990) (internal quotation marks omitted); see Bushman v. Seiler, 755 F.2d 653, 655 (8th Cir. 1985) ("[T]he act must have more or less connection with the general matters committed by law to the officer's control or supervision . . . ." (internal quotation marks omitted)). The university's decisions regarding how to proceed upon finding Kumar had engaged in research misconduct are reasonably related to their duty to "respond[] to . . . allegations of research misconduct." 42 C.F.R. § 93.100(b). Cf. Sloan v. HUD, 236 F.3d 756, 762 (D.C. Cir. 2001) (holding that in assessing whether function was discretionary an investigation could not be separated from "the suspension to which it assertedly led"). That an institution is required, as a condition of funding, to assure the government that it

---

security that give rise to his two privacy claims). Hence, the Court need not assess whether the university's disclosure of confidential information would be protected by official immunity.

has in place a policy for what action will be taken in the event of a final finding of misconduct evidences that the university's challenged decisions were within the scope of the university's official duties.  See 42 C.F.R. § 93.304(i) (requiring institutions to "have written policies and procedures for addressing research misconduct that include . . . [i]nstitutional actions in response to final findings of research misconduct").

The next inquiry under Westfall is whether the conduct at issue was discretionary, an inquiry that itself has two steps.  "Because sovereign immunity does not bar suits based on an employee's failure to follow a prescribed course of conduct," the first question is "whether any statute, regulation, or policy specifically prescribes a course of action."  Graham, 798 F.3d at 1138 (internal quotation marks omitted).  "If the tort claim arises from [the university's] failure to act as the law specifically prescribes, the conduct is" not discretionary, and therefore "not shielded by immunity."  Id.  But "[i]f the law leaves the conduct in question to the official's discretion," courts then ask a second question, "whether the exercise of discretion is grounded in social, economic, or political goals."  Id. (internal quotation marks omitted).  The relevant regulations do not prescribe a specific course of action for universities to take in response to final findings of misconduct.  So, the second question will control here: did the decisions at issue "implicate[] policy considerations." Cope v. Scott, 45 F.3d 445, 452 (D.C. Cir. 1995).[4]  This is an "admittedly difficult" determination "since nearly every government action is, at least to some extent, subject to policy analysis."  Id. at 448 (internal quotation marks omitted).

A principal purpose of Part 93 of the PHS regulations is to conserve public funds.  42 C.F.R. § 93.101(e); see id. § 93.100 ("Research misconduct involving PHS support is contrary to

---

[4] The Court relies on cases analyzing the "discretionary function" exception to the Federal Tort Claims Act because the federal common law of official immunity has "culled from the FTCA's 'discretionary function' jurisprudence."  KiSKA Const. Corp v. Wash. Metro. Area Transit Auth., 321 F.3d 1151, 1159 (D.C. Cir. 2003).

the interests of the PHS and the Federal Government and to . . . the conservation of public funds."). A university's assessment of how to treat <u>federal grants</u> implicated in a finding of research misconduct is grounded in the very essence of the regulatory regime.  <u>See</u> <u>Cope</u>, 45 F.3d at 449 ("The question is . . . whether the discretion is grounded in the policy of the regulatory regime." (internal quotation marks and emphasis omitted)).  The decision to relinquish funds—rather than proceed with the affected research—was left to the institution's discretion and the exercise of that discretion is directly tied to express regulatory policy goals and a key government interest at stake. Because the conduct was discretionary and within the scope of the university's duties, the Court must dismiss Kumar's tortious interference claim on official immunity grounds.

By contrast, a university's assessment of how to treat an <u>employee</u> implicated in a finding of research misconduct is not similarly grounded in the purpose of the regulatory regime.  In the Court's estimation, the university's decisions to remove Kumar as a thesis adviser and escort him out of his laboratory are not choices "fraught with public policy considerations."  <u>Cope</u>, 45 F.3d at 451 (internal quotation marks omitted).  GW disagrees—in its reply brief.  (The university's four-page principal brief—thin in both length and substance—did not even address how these particular actions were discretionary.  Def.'s Mem. in Supp. of 12(b)(1) Mot. to Dismiss [ECF No. 18-1] at 4.)  According to GW, it is "entitled to a presumption that its exercise of discretion" is grounded in social and economic policy because the governing regulations themselves are grounded in social and economic policy goals to "protect the health and safety of the public, promote the integrity of PHS supported research and the research process, and conserve public funds." Def.'s Reply in Supp. of 12(b)(1) Mot. to Dismiss [ECF No. 21] at 7–8 (internal quotation marks omitted) (citing <u>United States v. Gaubert</u>, 499 U.S. 315, 324–25 (1991)).  Since <u>Gaubert</u>, though, the D.C. Circuit has held the "mere association of a decision with regulatory concerns is

14

not enough" to qualify conduct as discretionary.  Cope, 45 F.3d at 449; see also KiSKA Const.

Corp. v. Wash. Metro. Area Transit Auth., 321 F.3d 1151, 1161 (D.C. Cir. 2003).  The university's

judgments about whether to remove Kumar as a thesis adviser and how to separate him from his

research lab certainly involved choices, but in the Court's view those choices do not implicate the

necessary "social, economic, or political goals" to qualify for official immunity.  Nor do they

further effective governance as necessary to justify granting immunity.  Because the alleged

conduct underlying Kumar's invasion of privacy claims is not discretionary, the university is not

immune from suit as to claims 4 and 5.

The winding journey through official immunity thus ends in relatively low reward for the

university.  The Court will dismiss only Kumar's claim for tortious interference on the ground of

official immunity.  For the remaining claims, the Court will proceed to address the arguments

raised in the university's 12(b)(6) motion to dismiss.

## II.   Alleged Failures to State a Claim

### A.  Legal Standard

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the plaintiff's complaint.

Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002).  Although a plaintiff need not set forth

"detailed factual allegations" to withstand a Rule 12(b)(6) motion, in order to establish the

"grounds" of his "entitlement to relief," a plaintiff must furnish "more than labels and conclusions"

or "a formulaic recitation of the elements of a cause of action."  Bell Atl. Corp. v. Twombly, 550

U.S. 544, 555 (2007) (internal quotation marks and brackets omitted).  The complaint must contain

sufficient factual matter to state a claim to relief that is plausible on its face.  Ashcroft v. Iqbal,

556 U.S. 662, 678 (2009).  And importantly, the court "must accept as true all material allegations

of the complaint, drawing all reasonable inferences from those allegations" in a plaintiff's favor.

LaRoque v. Holder, 650 F.3d 777, 785 (D.C. Cir. 2011) (internal quotation marks omitted).

## B. Discussion

### 1. Breach of Contract

Count I of Kumar's complaint alleges that the university has breached several contractual obligations through its conduct during and after the research misconduct investigation.  In the District of Columbia, "[t]o state a breach of contract claim, plaintiff must allege the following elements: '(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by the breach.'"  Mesumbe v. Howard Univ., 706 F. Supp. 2d 86, 94 (D.D.C. 2010) (quoting Tsintolas Realty Co. v. Mendez, 984 A.2d 181, 187 (D.C. 2009)).

"If the meaning of a contract is so clear that reasonable persons could reach but one conclusion or no extrinsic evidence is necessary to determine the contract's meaning, then contract interpretation is a matter for the court."  Howard Univ. v. Roberts-Williams, 37 A.3d 896, 906 (D.C. 2012) (internal quotation marks and brackets omitted).  If, on the other hand, the meaning of a contract is ambiguous, "then external evidence may be admitted to explain the surrounding circumstances and the position and actions of the parties at the time of contracting. The ultimate interpretation then becomes a question for the finder of fact."  Sobelsohn v. Am. Rental Mgmt. Co., 926 A.2d 713, 718 (D.C. 2007) (internal quotation marks omitted).  In the university setting, more specifically, contracts must be read in light of "the custom and practice of the [u]niversity" and "by reference to the norms of conduct and expectations founded upon them."  Roberts-Williams, 37 A.3d at 906.  But because evidence on those issues is lacking at this early stage of proceedings, the Court may properly decline to offer conclusive interpretations of ambiguous

contractual provisions when deciding a motion to dismiss.  See Wharf, Inc. v. District of Columbia,

No. 15-CV-1198 (CKK), 2015 WL 5693074, at *10 (D.D.C. Sept. 28, 2015) (citing Scowcroft

Grp., Inc. v. Toreador Res. Corp., 666 F. Supp. 2d 39, 43–44 (D.D.C. 2009)).

University handbooks, codes, and other policies can give rise to enforceable contractual

duties.  See, e.g., Wright v. Howard Univ., 60 A.3d 749, 751 (D.C. 2013) (faculty handbook is a

contract); Saha v. George Washington Univ., 577 F. Supp. 2d 439, 442 (D.D.C. 2008) (faculty

code and faculty handbook are contracts); Mesumbe, 706 F. Supp. 2d at 94 (university policies

define the contract).  Here, Kumar alleges that he is "in a contractual relationship with GW through

his employment agreements" and the university's "policies and procedures," First. Am. Compl.

¶ 127, which together define the parties' "rights and responsibilities," see id. ¶ 15.  The university

does not appear to dispute that these policies create contractually enforceable obligations.  Instead

its motion cedes that ground, proceeding directly to an attack on Kumar's interpretation of the

various policies and on the factual sufficiency of his complaint.[5]  See, e.g., Def.'s Reply in Supp.

of 12(b)(6) Mot. to Dismiss [ECF No. 17] at 1 (Def.'s 12(b)(6) Reply) ("The Court should decline

Kumar's invitations to disregard the plain language of the governing documents . . . ." (emphasis

---

[5] The documents and policies at issue—Kumar's employment letters, the Faculty Code and Handbook, and the Research Misconduct Policy—were submitted to the Court as attachments to the university's 12(b)(6) motion to dismiss and reply.  "At the motion to dismiss stage, the court may consider documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss."  Intelect Corp. v. Cellco P'ship GP, No. 15-CV-0902 (RC), 2016 WL 471266, at *20 (D.D.C. Feb. 5, 2016) (internal quotation marks and brackets omitted).  "The prototypical incorporation by reference occurs where a complaint claims breach of contract, and either party attaches to its pleading an authentic copy of the contract itself."  Banneker Ventures, LLC v. Graham, 798 F.3d 1119, 1133 (D.C. Cir. 2015).

Here, Kumar alleges that these documents constitute contracts between him and the university.  Although he asks the Court to exclude them from its consideration, see Pl.'s 12(b)(6) Opp'n at 3 n.3, his compliant necessarily relies upon them.  Because Kumar does not dispute the authenticity of the university's attachments, the Court will consider them in reaching its decision.

added)).  The remainder of this opinion will therefore focus on those arguments, while treating the various policies as enforceable contracts between the parties.

Kumar alleges that the university "breached its contracts . . . by failing to adhere to the procedures and protections set forth in [its] policies" during the misconduct investigation.  First Am. Compl. ¶ 129.  Most of these "procedures and protections" stem from the university's policy regarding allegations of research misconduct.  See Ex. C to Def.'s 12(b)(6) Mot. to Dismiss [ECF No. 8-4] (Research Misconduct Policy).  Under the Research Misconduct Policy, investigations "will be conducted in a manner that is designed to provide fair treatment to the respondent . . . and confidentiality to the extent possible without compromising public health and safety or the [investigation's] thoroughness."  Id. at 5.  They must also be conducted by a committee comprised of at least three individuals "who do not have real or apparent conflicts of interest in the case" and "are unbiased."  Id. at 10.  Before the investigation committee reaches a final conclusion, the respondent must be given an opportunity to comment on a draft investigation report.  Id.  at 11.  Final findings of misconduct must be based upon a "preponderance of the evidence" and "take into account the respondent's comments in addition to all the other evidence."  Id. at 10, 12.

Kumar has adequately alleged breaches of these contractual provisions.  Start with the confidentiality provision.  Kumar alleges that only he and the university were privy to certain information about the investigation.  First. Am. Compl. ¶ 29.  While the investigation was underway, "an anonymous source privy to confidential information about the [university's] inquiry released the confidential information to [an] online blog."  Id. ¶ 26; see also id. ¶ 27.  Kumar himself did not post the confidential information online.  Id. ¶ 29.  Having thus ruled himself out as the source of the leak, Kumar infers that the university either "released the information, assisted others in the release of the information, or failed to take the steps necessary to safeguard and

prevent [its] release," id. ¶ 29, and thereby breached its duty to conduct the investigation in a manner designed to protect his "confidentiality to the extent possible," Research Misconduct Policy at 5.   Based as it is upon the factual allegations in his complaint, that inference is a reasonable one to which Kumar is entitled at this stage.   LaRoque, 650 F.3d at 785.   But even if it was not, Kumar has adequately alleged a second breach of the confidentiality provision. According to the complaint, university sources with access to confidential information shared it with various individuals unconnected to the investigation.   First Am. Compl. ¶ 30.   That conduct, if it indeed occurred, could violate the policy's confidentiality provision as well.

The university resists this conclusion.   Even if Kumar is correct about these facts, the university argues, he has failed to allege a breach of the Research Misconduct Policy.   Under the university's reading of that policy, Kumar is not entitled to an "unfettered right of confidentiality." Def.'s 12(b)(6) Reply at 5.   Instead, the policy requires confidentiality only "'to the extent possible without compromising public health and safety or the thoroughness of the inquiry or investigation.'"   Id. (quoting Research Misconduct Policy at 5).   That is fair enough; Kumar may not be protected under the policy from breaches of confidentiality that were not "possible" to prevent.   But the university provides no reason to believe that the breaches alleged here—leaking confidential information onto a public website and sharing it with individuals unconnected to the investigation—should fall into that category.   At this stage, the Court cannot say conclusively that the alleged conduct falls outside the protections of the policy.

Kumar also adequately alleges a breach of the university's duty to empanel an investigation committee free from "real or apparent conflicts of interest" and bias.   Research Misconduct Policy at 10.   His most specific allegations focus on the appointment of Dr. Keith Crandall as chair of the investigation committee.   According to the complaint, during the investigation period, Crandall

maintained a professional relationship with a "former disgruntled employee" of Kumar's lab, First Am. Compl. ¶ 41, thereby creating the potential for Crandall to receive "information from the disgruntled employee about the Kumar laboratory outside the strictures of the investigation," id. ¶ 42.  Kumar also alleges that Crandall had a material interest in the outcome of the investigation proceedings because Crandall had "made repeated and directed requests" about occupying office space then allocated to Kumar's department.  Id. ¶ 41.  Taken together and taken as true, these allegations suffice to raise a question about Crandall's, and therefore the committee's, impartiality. So do Kumar's allegations regarding the committee's approach to the investigation.  According to the complaint, the committee asked "leading question[s]," id ¶ 48, "repeatedly misrepresented testimony," id. ¶ 49, "coached witnesses," id., ignored inconsistencies in witness testimony, id. ¶ 52, and denied Kumar the opportunity to address the same subjects addressed by other witnesses, id. ¶ 50.  Such behavior could also reasonably indicate the existence of an underlying bias.  See Furey v. Temple Univ., 730 F. Supp. 2d 380, 395–96 (E.D. Pa. 2010) (aggressive questioning of investigation respondent but deferential questioning of adverse witnesses could support a reasonable inference of bias).

Once again, the university claims that Kumar has offered an erroneous interpretation of the Research Misconduct Policy.  Under the policy, once the investigation respondent has been notified of the investigation committee composition, he has five days to raise an objection to any of its members.  Research Misconduct Policy at 10.  It is then the responsibility of the Provost to "determine whether to replace the challenged member with a qualified substitute."  Id.  Kumar successfully availed himself of this procedure once, when he objected to and secured the removal of a committee member who he thought lacked the expertise to participate in the investigation. First Am. Compl. ¶¶ 38–39.  But with respect to Crandall, Kumar failed to invoke these procedures

in a timely fashion, and the university refused his request to have Crandall removed from the committee.  Id. ¶¶ 40–43.  Because the policy grants the Provost "sole discretion" to replace committee members, and because Kumar did not timely request that Crandall be replaced, the university believes it has complied fully with the policy provision at issue.  Def.'s Mem. in Supp. of 12(b)(6) Mot. to Dismiss [ECF No. 8-1] at 9–11 (Def.'s 12(b)(6) Mem.).

But the university's reading of the policy is unduly narrow.  The Court does not doubt that the university complied with the procedural mechanisms for removal of committee members.  The university does not explain, however, why compliance with those procedures should absolve it of its responsibility to empanel an investigation committee comprised of "at least three individuals who do not have real or apparent conflicts of interest in the case" and "are unbiased."  Research Misconduct Policy at 10.  In the Court's view, the language of the policy does not unambiguously require Kumar to live with a biased committee that was empaneled in a procedurally proper way.  Because Kumar has adequately alleged the existence of bias, he has adequately alleged a breach of the Research Misconduct Policy.

Kumar's allegation that the university failed to adequately "take into account" his comments on the draft investigation report is also sufficiently pled.  See Research Misconduct Policy at 12.  The university does not dispute that it had a contractual obligation to consider Kumar's comments.  It argues instead that Kumar has failed to adequately allege that his comments were disregarded.  See Def.'s 12(b)(6) Mem. at 11–12.  The university's assessment is incorrect.  In response to the draft investigation report, Kumar allegedly submitted eighty pages of comments challenging the committee's conclusions.  First Am. Compl. ¶ 54.  His argument drew upon "missed and new physical evidence" and "specific citations to the record," including to "transcripts of the witness interviews."  Id.  But despite Kumar's extensive response, the committee's final

investigation report was "nearly identical" to the draft investigation report.  Id. ¶ 58.  Kumar believes that the university's failure to respond in writing to his arguments indicates a larger failure to take them into account, as required by the Research Misconduct Policy.  This inference, too, is reasonable and supported by the factual allegations of the complaint.

Kumar further alleges that the university breached the Research Misconduct Policy by arriving at conclusions that were not supported by a "preponderance of the evidence."  See Research Misconduct Policy at 10.  Here, again, the university challenges only the factual sufficiency of Kumar's complaint.  See Def.'s 12(b)(6) Mem. at 11–12.  Of course, the Court need not accept "legal conclusions cast in the form of factual allegations."  Browning, 292 F.3d at 242 (internal quotation marks omitted).  But in this case, Kumar has offered factual allegations sufficient to call into question the fundamental fairness of the committee's investigation.  If the committee indeed abused the investigation process in the manner that Kumar has alleged, it would be reasonable to doubt the soundness of the committee's ultimate conclusions.

The university raises a number of arguments in response.  Throughout its motion to dismiss, the university protests that most of Kumar's "factual" allegations are actually just "conclusory allegations," "bald assertion[s]," and "pure conjecture"—none of which is entitled to an assumption of truth.  Def.'s 12(b)(6) Mem. at 11, 16.  But Kumar has plainly alleged more than mere labels and conclusions.  See Twombly, 550 U.S. at 555.  In the portions of the complaint discussed above, Kumar does not merely state that the university breached its contractual obligations.  Instead, he identifies specific contractual provisions and supplies factual bases on which to find a breach.  To take one example, Kumar's right to confidentiality was allegedly violated when confidential information was leaked to a public blog and to other faculty members.  See First Am. Compl. ¶¶ 26–30.  To take another, Crandall was allegedly biased because of his

professional relationship with one of Kumar's former employees and his interest in Kumar's department's office space.  See id. ¶¶ 41.  At this stage, more "detailed factual allegations" are not needed.  Twombly, 550 U.S. at 555.

The university also objects that Kumar's account is contrary to the facts, and (improperly) attempts to bring information contradicting his account to the Court's attention.  See, e.g., Def.'s 12(b)(6) Mem. at 12 n.11 (information regarding the content of the final investigation report); id. at 17–18 (information regarding online allegations of research misconduct).  But as the university surely understands, the Court may consider only the facts alleged in the complaint (and, in this case, the applicable policies) when assessing its motion to dismiss.  See, e.g., Paulin v. George Washington Univ. Sch. of Med. & Health Scis., 878 F. Supp. 2d 241, 246 (D.D.C. 2012).  The university will soon have the opportunity to dispute Kumar's factual allegations.  For the time being, however, its objection to the accuracy of Kumar's complaint is beside the point.

Finally, the university protests that Kumar is asking the Court to "second-guess" the conclusion of the university's research misconduct investigation.  Def.'s 12(b)(6) Mem. at 1.  The Court recognizes that it "must be careful not to substitute its judgment improperly for the academic judgment" of the university when "determining whether [the] university has complied with its own rules or contract."  Allworth v. Howard Univ., 890 A.2d 194, 202 (D.C. 2006) (internal quotation marks omitted).  Following that directive, at least one court in this district has looked for allegations of arbitrary and capricious university action when determining whether a dismissed student had stated a claim for breach of contract.  See Paulin, 878 F. Supp. 2d at 247.  But as discussed below, Kumar has successfully alleged that the university's conduct of the misconduct investigation was arbitrary and capricious.  Deference to the university's judgment does not require the Court to dismiss Kumar's otherwise valid complaint prior to discovery.  Indeed, many cases

arising out of university decisions are resolved after discovery, at the summary judgment stage. See, e.g., Chenari v. George Washington Univ., No. 14-CV-0929 (ABJ), 2016 WL 1170922, at *1 (D.D.C. Mar. 23, 2016) (medical school student dismissal); Wright, 60 A.3d at 750 (denial of tenure); Allworth, 890 A.2d at 196 (denial of tenure); Alden v. Georgetown Univ., 734 A.2d 1103, 1103–04 (D.C. 1999) (medical school student dismissal).  The university provides no compelling reason why Kumar's breach of contract claim cannot reach that stage as well.

This opinion should not, however, be read as an endorsement of every contract theory in Kumar's complaint.  For example, Kumar argues that the university breached his contract by "[f]ailing to follow its own procedures for grant processing," First Am. Compl. ¶ 129, when it relinquished one research grant and delayed his applications for others, see id. ¶¶ 80–85.  Kumar does not attempt to argue that he had "contractual or property rights" in the grants themselves. Pl.'s Opp'n to Def.'s 12(b)(6) Mot. to Dismiss [ECF No. 12] at 30 (Pl.'s 12(b)(6) Opp'n).  Instead, he seeks to vindicate "his rights under GW's research misconduct policies."  Id.  But the policies which Kumar cites appear to create obligations for the university rather than rights for investigation respondents.  The first policy explains that the university "will take appropriate administrative actions against individuals when an allegation of research misconduct has been substantiated as determined by the Provost after consultation with the [Research Investigation Officer]," and lists a number of permissible actions.  Research Misconduct Policy at 15 (emphasis added).  The second explains that university officials "will take interim administrative actions, as appropriate, to protect Federal funds, protect ongoing research activities, and support the purposes of the Federal financial assistance."  Id. at 17 (emphasis added).

Kumar clearly believes that the allegations against him were unsubstantiated.  It follows, in Kumar's view, that the university's actions with respect to the grants cannot be justified.  But

Kumar overreads the policies.  For one, they do not mention grants at all.  Even assuming, however, that the policies address the university's discretion to manage its grants, they do not seem to provide Kumar with an avenue to relief.  By their plain language, the policies establish what the university <u>must</u> do to protect federal funds or when allegations of research misconduct are substantiated.  They do not appear to define what the university <u>may</u> do with its grants in other circumstances.  Without compelling evidence of academic custom or practice, <u>see</u> <u>Roberts-Williams</u>, 37 A.3d at 906, Kumar's interpretation of this provision is suspect.

Some of Kumar's other theories implausibly stretch contractual language.  This Court is skeptical of Kumar's claim that the letter appointing him department chair, to serve "at the pleasure of the Dean," <u>see</u> Ex. A to Def.'s 12(b)(6) Mot. to Dismiss [ECF No. 8-2] at 2, can be read to confer "for cause" job protection, <u>see</u> Pl.'s 12(b)(6) Opp'n at 8.  It also doubts Kumar's argument that the Faculty Code, which guarantees "freedom of investigation," <u>see</u> Ex. A to Def.'s 12(b)(6) Reply [ECF No. 17-1] at 2, guaranteed his right to advise a Ph.D. student's dissertation to completion—even though he was only removed from the project one week before the student's public defense, and after all "investigation" had ceased, <u>see</u> First Am. Compl. ¶¶ 91–99.  Similarly dubious is Kumar's assertion that the threat of tenure-revocation, the closure of his laboratory, and his embarrassing escort from campus violated his "rights as a tenured professor and the provisions set forth in the Faculty Code."  <u>See</u> <u>id.</u> ¶¶ 100–05.  Such allegations, unmoored from any particular contractual provision, are likely insufficient.  <u>See</u> <u>Hajjar-Nejad v. George Washington Univ.</u>, 802 F. Supp. 2d 166, 174–75 (D.D.C. 2011) (allegations that university violated its "policies" and "regulations" are generally insufficient to state a claim); <u>Saha</u>, 577 F. Supp. 2d at 442–43 (plaintiff fails to state a claim where he does not "identif[y] specific breached provisions nor attach[] any text of the [relevant handbook or policy] for the Court to consider").  But nonetheless, at this early

stage, Kumar has pled <u>some</u> facts to support his claim for breach of contract.  The university's motion to dismiss that claim must therefore be denied.

### 2.  Breach of the Implied Covenant of Good Faith and Fair Dealing

Count II of Kumar's complaint states a claim for breach of the implied covenant of good faith and fair dealing.  Under District of Columbia law, "all contracts contain an implied duty of good faith and fair dealing, which means that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." <u>Allworth</u>, 890 A.2d at 201 (internal quotation marks omitted).  "A party breaches this duty by evading the spirit of the contract, willfully rendering imperfect performance, or interfering with performance by the other party." <u>Paulin</u>, 878 F. Supp. 2d at 247–48 (internal quotation marks and brackets omitted) (citing <u>Allworth</u>, 890 A.2d at 201).  "To state a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must allege either bad faith or conduct that is arbitrary and capricious." <u>Wright</u>, 60 A.3d at 754.  "The test for determining whether a [d]efendant's actions breached the covenant of good faith and fair dealing is a reasonableness inquiry." <u>Paulin</u>, 878 F. Supp. 2d at 248 (citing <u>Allworth</u>, 890 A.2d at 202).

Kumar has successfully stated a claim for breach of the covenant here.  Fairly construed, his complaint alleges more than a good-faith disagreement about the scope of the Research Misconduct Policy's protections.  As discussed above, Kumar alleges that a biased investigation committee intentionally steered its investigation toward its "preconceived conclusions" regarding his misconduct, while effectively disregarding evidence to the contrary.  First Am. Compl. ¶ 52; <u>see also</u> <u>id.</u> ¶¶ 47–52.  If those allegations are true, the committee's investigation report could not be fairly characterized as the product of reasoned decision-making.  Cf. <u>Butte Cty. v. Hogen</u>, 613 F.3d 190, 194 (D.C. Cir. 2010) (agency action is arbitrary and capricious where the agency

"ignore[s] evidence contradicting its position").  By adequately alleging that the investigation was conducted in an arbitrary and capricious manner, Kumar successfully states a claim for breach of the implied covenant of good faith and fair dealing.

Kumar's complaint also includes a list of university actions taken as a result of the investigation that are said to have "destroy[ed]" his "right to the fruits of his contractual relations with GW," First Am. Compl. ¶ 134, where he remains a tenured professor in the Department of Biochemistry and Molecular Medicine, id. ¶ 122.  It is difficult to see how some of these actions would destroy Kumar's ability to perform on his contract.  To take one example, Kumar does not explain how his removal as Chair of the Department hindered his performance as a professor.  Kumar also leaves the Court guessing as to how his escort from campus or his removal as a dissertation advisor interfered with his ability to perform his contractual duties.  Some of Kumar's remaining allegations are more plausible, however.  For example, following the misconduct investigation, the university barred Kumar from his office and laboratory and relinquished grants funding his research.  Id. ¶ 133.  Those steps, surely, could significantly disrupt Kumar's scholarly activity.  It is also possible to infer, based on the allegations of the complaint, that those actions were arbitrary and capricious.  The university, of course, argues that the actions were properly taken following the conclusion of the misconduct investigation.  See Def.'s 12(b)(6) Mem. at 12–16.  But Kumar has successfully alleged that the misconduct investigation was conducted in an arbitrary and capricious manner.  If Kumar can prove those allegations to be true, it would be reasonable for the fact-finder to conclude that these decisions suffer from the same defect.

### 3.  Tortious Invasion of Privacy

The Court turns finally to Kumar's two tortious invasion of privacy claims: public disclosure of private facts (Count IV) and false light (Count V).  "The tort [of public disclosure of

27

private facts] is generally considered as having five constituent elements: (1) publicity, (2) absent any waiver or privilege, (3) given to private facts (4) in which the public has no legitimate concern (5) and which would be highly offensive to a reasonable person of ordinary sensibilities." <u>Wolf v. Regardie</u>, 553 A.2d 1213, 1220 (D.C. 1989); <u>see also</u> Restatement (Second) of Torts § 652D. The tort of false light entails "1) publicity 2) about a false statement, representation or imputation 3) understood to be of and concerning the plaintiff, and 4) which places the plaintiff in a false light that would be offensive to a reasonable person." <u>Kitt v. Capital Concerts, Inc.</u>, 742 A.2d 856, 859 (D.C. 1999); <u>see also</u> Restatement (Second) of Torts § 652E.

Kumar's allegations that GW improperly disassociated him from his student's dissertation and disgracefully escorted him from his laboratory are insufficient to support these claims.[6]  Start with the matter of his student's thesis.  The key allegations are these: On July 25, 2014, GW sent emails to more than 100 people announcing the student's upcoming dissertation defense and identifying Kumar as her research mentor.  First Am. Compl. ¶ 95.  Later that day, however, GW removed Kumar as the student's supervisor, and on July 29 appointed a new supervisor, Dr. Anelia Horvath.  <u>Id.</u> ¶ 96.  GW presented Horvath as the student's thesis advisor at the public defense on August 1, 2014.  <u>Id.</u> ¶ 97.  The student's final thesis, submitted on August 9, 2014, "incorrectly"

---

[6] As discussed above, <u>see</u> <u>supra</u> p. 11 n.3, Kumar has disclaimed any reliance on the disclosure of confidential information as the basis for his invasion of privacy claims.  And in any event, insofar as these claims are based on the allegation that GW leaked confidential information that wound up on the blog RetractionWatch.com, they are time-barred by the one-year statute of limitations applicable to these torts. <u>See</u> <u>Greenpeace, Inc. v. Dow Chem. Co.</u>, 97 A.3d 1053, 1061–62 (D.C. 2014) (one-year statute of limitations for invasion of privacy torts).  That is so because the alleged leaks must have occurred by March 2013, when the posts showed up on the website—which was more than a year before Kumar instituted this suit.  First Am. Compl. ¶ 27; <u>see</u> Def.'s 12(b)(6) Mem. at 21–22.  In his opposition, Kumar does not dispute this analysis with respect to the RetractionWatch.com postings, effectively conceding that the statute of limitations is a bar.  Pl.'s 12(b)(6) Opp'n at 37–38; <u>see</u> <u>Day v. D.C. Dep't of Consumer & Regulatory Affairs</u>, 191 F. Supp. 2d 154, 159 (D.D.C. 2002) ("If a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded.").

listed Horvath as the student's dissertation director "for the entire research period," notwithstanding that Kumar had supervised her work until July 2014.  Id.

These allegations fail to establish a claim of public disclosure of private facts.  Kumar has not identified any "private fact" about himself that GW publicly disclosed.  To the contrary, the gravamen of Kumar's allegations is that GW improperly <u>failed</u> to disclose a certain fact about him (namely, that he was the student's supervisor) that he wished to be <u>public</u>.  This claim thus clearly fails as a matter of law.

The claim of false light fails also.  Kumar contends that "GW's presentation of Dr. Horvath as [the student's] thes[i]s advisor created a false impression that Dr. Kumar was not [her] thesis advis[o]r at any point in time."  Pl.'s 12(b)(6) Opp'n at 39.  But that conclusion is simply not supported by the particular facts Kumar has alleged.  Quite the opposite: Kumar has admitted that roughly a week before the dissertation defense GW sent a mass email that identified him as the student's research mentor, which was true at that time.  First Am. Compl. ¶ 95.  GW's subsequent introduction of Horvath as the student's advisor at the defense was also true.  <u>See id.</u> ¶ 96 (admitting that GW appointed Horvath after the mass email).  No rational factfinder could conclude that this combination of true statements gave the false impression that Kumar had <u>never</u> been the student's advisor.  The impression these true statements likely gave was that Horvath had <u>replaced</u> Kumar as the student's advisor—that is, the truth.  Kumar of course does not think Horvath <u>should</u> have replaced him, and he may have found GW's presentation of Horvath humiliating insofar as it implicitly revealed that he had been replaced, but none of that gives Kumar a viable false light claim.  For "it is essential to" a false light claim "that the matter published concerning the plaintiff is not true."  Restatement (Second) of Torts § 652E, cmt. a.  Kumar simply

has not alleged that, in failing to identify him as the student's advisor, GW published any untrue matter about him.

Kumar's allegation that the student's final thesis "incorrectly" listed Horvath as the advisor "for the entire research period" does not save his false light claim.  Kumar has failed to allege that GW gave "publicity" to this statement, which was apparently made by the student, not GW.  See First Am. Compl. ¶ 97.  "Publicity means that the defendant has communicated the matter in such a manner that it is 'substantially likely to become one of public knowledge.'"  Doe v. Bernabei & Wachtel, PLLC, 116 A.3d 1262, 1266 (D.C. 2015) (quoting Restatement (Second) of Torts § 652D, cmt. a).  Kumar has not alleged that GW ever distributed or even showed the thesis to anyone.

At bottom, Kumar's complaint about being dissociated from his student's thesis is not that he was cast in a false and offensive light.  It is that he was not cast in an accurate and flattering light.  GW, in Kumar's view, did not give him credit that he rightfully deserves.  Maybe so, but Kumar has not cited, nor has this Court found, any precedent suggesting that the failure to give credit due is tantamount to the tort of false light.

Turn next to the incident in which Kumar was escorted out of his lab by GW security.  The relevant allegations are these: On July 25, 2014, at 1:30 pm, GW officials told Kumar that they were initiating the immediate closure of his lab and office.  First Am. Compl. ¶ 103.  Kumar was told not to meet alone with his lab members or department faculty before leaving campus, which he was to do immediately.  Id. ¶¶ 104–05.  The acting department chair nonetheless agreed to chaperone Kumar back to his office, where Kumar had a meeting with his faculty and office staff.  Id. ¶ 105.  At 2:30 pm, however, GW security arrived, demanded that Kumar stop the meeting,

and informed him that they were there to escort him from the building, which they did.   Id.
Kumar's removal "was very public and humiliating."   Id.

This set of allegations does not support either of the privacy torts that Kumar claims.  GW
did not disclose any private facts about Kumar by escorting him out of the building.  Nor did GW's
actions give publicity to any false statement, representation, or imputation about Kumar.  The mere
fact that a defendant's conduct was "public and humiliating" does not make it an invasion of
privacy.  On that flawed logic almost any assault or battery occurring in public would also become
public disclosure of private facts and false light.  Kumar cites no authority for such an expansive
reading of these torts, which are clearly aimed, more narrowly, at the wrongful public
dissemination of information.  Having security escort Kumar off campus may or may not have
been wrongful conduct, but it was in no sense an invasion of his privacy.

## CONCLUSION

For the reasons set forth above, the Court will grant in part and deny in part GW's motions
to dismiss.  Specifically, the motion to dismiss on immunity grounds will be granted as to Count
III and will be denied as to the remaining claims.  The motion to dismiss for failure to state a claim
will be granted as to Counts IV and V and denied as to Counts I and II.  An appropriate Order
accompanies this Memorandum Opinion.

_____/s/_____
JOHN D. BATES
United States District Judge

Dated:  March 31, 2016